Norman BIRNBAUM, Plaintiff,
v.
UNITED STATES of America et al., Defendants.

B. Leonard AVERY, Plaintiff,
v.
UNITED STATES of America et al., Defendants.

Mary Rule MacMILLEN, Plaintiff,
v.
UNITED STATES of America, Defendant.

Civ. A. Nos. 76–1837, 77–C–234, 77–C–597.

United States District Court,
E. D. New York.

Aug. 17, 1977.

Rabinowitz, Boudin & Standard, New York City, for plaintiff Birnbaum; Herbert Jordan, K. Randlett Walster, New York City, of counsel.

Melvin L. Wulf, Burt Neuborne, New York City, for plaintiffs Avery and MacMillen.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., David G. Trager, U. S. Atty., Edward S. Rudofsky, Rodger C. Field, Asst. U. S. Attys., Brooklyn, N. Y., Dennis G. Linder, John T. Boese, Alphonse M. Alfano, Lawrence J. Jensen, Attys., Dept. of Justice, Washington, D. C., for defendants.

**WEINSTEIN, District Judge.**

In each of these three cases consolidated for trial the plaintiff complains that first-class mail was intercepted by the Central Intelligence Agency (CIA), opened without warrant and copied. Birnbaum and MacMillen each sent a letter abroad; Avery received one here. All the letters were resealed after copying and promptly returned to the mails. Plaintiffs, individually and as a class, seek to recover damages under the Federal Tort Claims Act. 28 U.S.C. § 1346(b) (the Act).

As explained in detail below:

(1) The court has jurisdiction to entertain these suits.

(2) A class action is not appropriate.

(3) The CIA acted tortiously under New York law in violating the plaintiffs' rights, both common law and constitutional, to privacy in their personal papers and correspondence.

(4) The court had the power to empanel an advisory jury and to rely upon its expression of community consensus that individual rights of privacy are valuable in this nation; that people do suffer psychic damage when United States agents fail to obey the law and violate individual rights; and that plaintiffs should be awarded substantial money damages.

(5) A letter from the government to each plaintiff expressing regret for the violation of his or her rights and indicating that steps will be taken to prevent a recurrence will ameliorate the harm by helping to restore plaintiffs' faith in their government.

(6) Recovery is granted to each individual plaintiff in the amount of $1,000 plus costs.

(7) In this country we do not pay lip service to the value of human rights and individual dignity—we mean to live by our ideals. A primary role of the courts is to translate these noble sentiments into palpable reality.

## I. FACTUAL BACKGROUND

From approximately 1953 until 1973, in violation of federal statutes and the Fourth Amendment of the United States Constitution, the Central Intelligence Agency conducted an extensive program of opening first-class mail passing in and out of the country through Hawaii, San Francisco, New Orleans, and New York.

Most of the correspondence opened, photographed and circulated within the CIA and the Federal Bureau of Investigation (FBI) was intercepted by the New York project, known within the CIA by either of the two code names HTLINGUAL or SRPOINTER. Various criteria were employed in selecting letters for inspection. Sometimes the name of either the intended recipient or sender appeared on a "watch list" of "suspect" persons and institutions compiled by CIA and FBI agents. In other instances envelopes were opened because of the country of origin or destination; any letter to or from the Soviet Union, for example, was subject to inspection. In still other situations mail was examined at random. When HTLINGUAL was at its peak, New York agents investigated some 13,000 letters a year; over the life of the project, at least 215,000 pieces of mail were copied. See generally Commission on CIA Activities Within the United States, The CIA's Mail Intercepts, in Report to the President 101–15 (1975); Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, Domestic CIA and FBI Mail Opening Programs, in III Final Report: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans, Sen.Rep. No. 94–755, 94th Cong., 2d Sess. 559–677 (1976).

Ultimately, the CIA collected and placed in computers a list of some 1.5 million names gleaned from its various mail-opening projects. Among those whose mail was read and photographed were author John Steinbeck and Senator Frank Church. Schwarz, Intelligence Activities and the Rights of Americans, 32 The Record of the Association of the Bar of the City of New York 43, 48 (1977). These operations were only part of a general pattern of post-World War II lawlessness and abuse of power exemplifying "contempt for the law and the Constitution" by government. Schwarz at 46. Breaking this pernicious pattern and preventing its recurrence is the task of Congress and the President. The limited question before this court is whether and how reparations can be made to individuals who were personally affected by this partial breakdown in official respect for individual liberties.

Plaintiff Norman Birnbaum is a professor of sociology at Amherst College in Massachusetts. In 1970, he wrote letters to two academic colleagues—one in Canada, and the other in Rumania—about an upcoming meeting of specialists in the sociology of religion. He sent copies of those letters to a third colleague at Moscow State University. HTLINGUAL agents copied the contents of this third letter while it was in transit through the foreign mail depot at Kennedy International Airport, and later distributed four copies to various units of the CIA. According to testimony by a member of the staff of the Inspector General of the CIA, this was done solely because intelligence agencies had an "interest" in correspondence to and from Moscow University.

Plaintiff Mary Rule MacMillen wrote a personal letter in 1973 to a Soviet dissident she had met on a trip to Russia. Her letter was intercepted at Kennedy, opened and photographed, and a copy filed by the agency. But, apparently because project HTLINGUAL was terminated two weeks later, no other reproductions were disseminated.

In the final case, that of B. Leonard Avery, a letter was written to him by his son, who was then an exchange student studying at Moscow State University. Ironically, Avery, concerned that his own letters to his son might be tampered with by Soviet authorities, attempted to avoid that possibility by sending them to the American Embassy in Vienna, where they were passed on to Moscow via diplomatic pouch. His son's replies, however, arrived

972

by regular mail, and one of them, personal in nature, was opened here in 1968. Three copies of that letter were made, and one of these was sent to the FBI, which was described by a government witness as having "an interest in U.S. exchange students in Russia."

None of the plaintiffs were aware that their mail had been interfered with until the government responded to general requests made under the Freedom of Information Act. 5 U.S.C. § 552. They were then notified that CIA files contained copies of the letters at issue.

■ These facts are not in dispute. The government concedes that the plaintiffs' mail was opened, read and copied. It does not contend that the actions were lawful. No judicial warrants were obtained, and no evidence was submitted to suggest the existence of probable cause for a warrantless search. Both the First and Fourth Amendments of the Constitution as well as applicable statutes and regulations support the conclusion that the opening and reading of these letters under these circumstances was illegal. *United States v. Ramsey*, —— U.S. ——, ——, ——, 97 S.Ct. 1972, 1982, 52 L.Ed.2d 617, 631 (1977) ("Applicable postal regulations flatly prohibit, under all circumstances, the reading of correspondence absent a search warrant"); *Procunier v. Martinez*, 416 U.S. 396, 408–09, 94 S.Ct. 1800, 1809, 40 L.Ed.2d 224 (1974). *Cf. United States v. Van Leeuwen*, 397 U.S. 249, 251, 90 S.Ct. 1029, 1031, 25 L.Ed.2d 282 (1970).

In addition, HTLINGUAL and other mail-opening projects probably violated several criminal statutes. Included are 18 U.S.C. § 1702 (prohibiting the unauthorized opening or obstruction of mail within postal channels), 18 U.S.C. § 241 (prohibiting conspiracies to deprive citizens of their constitutional rights), and 18 U.S.C. § 371 (the general conspiracy statute). *See generally* Department of Justice, Report of the Department of Justice Concerning Its Investigation and Prosecutorial Decisions with Respect to Central Intelligence Agency Mail

Opening Activities in the United States (1977).

The criminal liability—or lack of it—of government agents for the acts complained of is not an issue in this case. Plaintiffs seek a civil remedy: damages for injury suffered as a result of the operation of HTLINGUAL. They seek relief, not against the particular agents who opened their mail or who directed the program, but against the government, relying on the provisions of the Federal Tort Claims Act.

Because the agents were acting within the scope of their employment in carrying out the mail project, *Hatahley v. United States*, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956); *Avery v. United States*, 434 F.Supp. 937 (D.Conn. 1977), only two substantial questions must be answered. First, has the government consented to such suits under the provisions of the Act? Second, under the relevant state law—that of New York—was the behavior of the government agents tortious and, therefore, compensable?

## II. JURISDICTION

### A. Not Defeated By Exception To The Federal Tort Claims Act.

The United States has given its consent to be sued for torts in the District Courts whenever the government, if a private person, would be liable under the law of the place where the wrong was done. The Federal Tort Claims Act provides in part:

[T]he district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the

claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). This general consent to suit for tortious acts of government officials and employees is qualified by a number of exceptions. 28 U.S.C. § 2680. The government argues that three exceptions—for discretionary acts, for postal matter, and for intentional torts—apply.

### 1. Discretionary Function Exception Does Not Apply.

Under section 2680(a) of title 28 of the United States Code the government is not liable in tort for the performance or failure to perform a discretionary act:

§ 2680. Exceptions

The provisions of this [Act] shall not apply to—

> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Any attempt to define "discretionary" in this context presents difficulties. The government relies primarily on *Dalehite v. United States*, 346 U.S. 15, 35–36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953), holding that discretionary acts include not only "the initiation of programs and activities", 346 U.S. at 35, 73 S.Ct. at 968, but also

> determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion.

Id. (Footnotes omitted.) While this language seems broad enough to encompass the acts complained of here, the underlying facts of the case suggest the contrary. *Dalehite* concerned explosions aboard ships loaded with ammonium nitrate fertilizer.

Following World War II, the United States had sponsored the production of the highly explosive chemical product by American manufacturers in part to help alleviate acute food shortages in the occupied nations of Germany, Korea and Japan. While the wisdom of producing so dangerous a form of fertilizer was questionable, the thrust of the suit was against the *judgment* of government officials in approving the program. No negligence or illegality in carrying it out was averred.

*Dalehite* was followed in *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972), a suit to recover for damage caused by sonic booms resulting from high-altitude military training flights. There, too, the government, as a matter of policy, had decided to engage in a hazardous, but legal, activity. The Court quoted, in its decision, that portion of the House Judiciary Committee report emphasizing that the purpose of the discretionary acts exemption in the Tort Claims Act was to exclude suits for

> damages . . . growing out of a *legally authorized activity*, such as a flood-control or irrigation project, *where no wrongful act or omission on the part of any Government agent is shown*, and the only ground for suit is the contention that the same conduct by a private individual would be tortious.

406 U.S. at 801, 92 S.Ct. at 1902 (emphasis added).

The decision to conduct an intelligence operation by methods which violate the Constitution of the United States and which also probably violate several federal statutes is not discretionary in the same sense that the decision to fly a supersonic plane over land or to produce potentially explosive fertilizer might be. There is no evidence that Congress intended this exception to do more than free the operations of government from excessive concern over the untoward, and often unexpected, results of legitimate activity conducted in the public interest.

■ There is no discretion under our system to conceive, plan and execute an

illegal program. *See Hatahley v. United States,* 351 U.S. 173, 191, 76 S.Ct. 745, 100 L.Ed. 1065 (1956); *Myers & Myers, Inc. v. United States Postal Service,* 527 F.2d 1252, 1261 (2d Cir. 1975); *Avery v. United States,* 434 F.Supp. 937 (D.Conn. 1977). As the Second Circuit succinctly put the matter: "a federal official cannot have discretion to behave unconstitutionally." *Myers & Myers, Inc. v. United States Postal Service,* 527 F.2d at 1261. In this circuit, following *Myers* and *Avery,* the discretionary defense must be rejected. Cases from other circuits to the contrary are not persuasive. *See Murphy v. United States,* 76–C–12 (N.D. Iowa May 28, 1976) (dictum); *Hardy v. United States,* 76–C–1427 (D.C.D.C. Feb. 14, 1977) (relies on *Murphy*); *Siebel v. United States,* 76–C–1737 (N.D.Cal. Dec. 17, 1976) (relies on *Dalehite*).

### 2. Postal Matter Exception Does Not Apply.

■ The United States also argues that these suits for damages against the government are barred by the postal matter exception to the Federal Tort Claims Act because the opening of the letters represents a mere "miscarriage" of the mail. 28 U.S.C. § 2680(b). This portion of the statute maintains sovereign immunity with regard to:

(b) Any claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter.

None of the available sources for the interpretation of this subsection support such a restrictive reading. Rather, Congress was concerned with shielding the courts from the potential landslide of lawsuits that might be generated by the unavoidable mishaps incident to the ordinary, accepted operation of delivering millions of packages and letters each year. The kind of problem that was anticipated under the heading of "loss, miscarriage or negligent transmission" was suggested by a representative of the Department of Justice during hearings on the Act:

Every person who sends a piece of postal matter can protect himself by registering

it, as provided by the postal laws and regulations. It would be intolerable, of course, if in any case of loss or delay, the Government could be sued for damages. Consequently, this provision was inserted.

Hearings before Senate Committee on the Judiciary on S. 2690, 76th Cong., 3d Sess. 38 (1940) (testimony of A. Holtzoff, Special Assistant to Attorney General of the United States.) Neither registration nor insurance of the letters in question,in these cases would have protected the correspondents from the risk that CIA agents would procure, open and copy their mail. *See also,* Note, *The Federal Tort Claims Act,* 56 Yale L.J. 534, 545–46 (1947); II L. Jayson, Handling Federal Tort Claims § 255 at 13–2—13–3 (1975).

The postal exception has no application in cases such as those before us. *Cruikshank v. United States,* 76–C–362, 431 F.Supp. 1355 (D.Haw. May 9, 1977); *Avery v. United States,* 434 F.Supp. 937 (D.Conn. 1977).

### 3. The Intentional Tort Exception Does Not Apply.

The final statutory defense of the United States is based on subdivision (h) of 28 U.S.C. § 2680. This provision, exempting the federal government from suits for specified intentional torts, reads as follows:

The provisions of [the Act] shall not apply to—

(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided,* That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the

United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

Prior to 1976, when the subsection was revised, it merely provided that no suit could be brought for:

(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

28 U.S.C.A. § 2680 (1965). Congress amended the exception to broaden its consent to suit following some particularly egregious violations of the Fourth Amendment by federal narcotics agents who engaged in a series of illegal "no-knock" raids on private homes. One such raid generated a civil suit in which the Supreme Court—barred by section 2680(h), as it was then written, from holding the government itself liable—granted plaintiff the right to recover damages from the individual agents. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Congress altered section 2680(h) so that, from the date of amendment forward, such Fourth Amendment violations would be actionable against the government, providing aggrieved persons actual relief, rather than worthless awards against "judgment-proof" individual agents. S.Rep. No. 83–588, 93d Cong., 2d Sess., 2–3, reprinted in [1974] U.S.Code & Cong.Ad. News 2789, 2790–91.

The government argues that, based on this history of subsection (h), a court cannot assume that any case arising from a Fourth Amendment violation was intended, prior to 1974, to be included in the Act. The government's position apparently is that the list of exempted torts in subsection (h) was and is not exclusive, and that additional exclusions must be implied, where necessary, to protect the government against liability for types of torts Congress may not have contemplated when it drafted the law. Invasion of the constitutional right to privacy is one such uncontemplated intentional

tort, runs the argument, and should be excluded—at least if it occurred before 1974.

■ Implied exceptions, derived in this wholesale fashion, subvert the structure of the statute itself. Congress, in writing the Act, chose to enumerate very specific exemptions. No vague terms or general words are used. This problem was treated in *Ira S. Bushey & Sons, Inc. v. United States*, 276 F.Supp. 518 (E.D.N.Y.1967), aff'd, 398 F.2d 167 (2d Cir. 1968). The court concluded that:

The detailed listing and the absence of general terms suggests that only the torts mentioned are to be excluded.

276 F.Supp. at 526. Invasion of privacy, common law or constitutional, is not mentioned in the list either before or after 1974, and for that reason is not excluded. *See Avery v. United States*, 434 F.Supp. 937 (D.Conn., 1977) (same conclusion with respect to the HTLINGUAL program); *contra, Murphy v. Central Intelligence Agency*, 76–C–12 (N.D.Iowa, May 28, 1976) (dictum). As the court in *Cruikshank v. United States*, 76–C–362, 431 F.Supp. 1355 (D.Haw., May 9, 1977), put it when faced with a case similar to those of Birnbaum, Avery and MacMillen:

[W]e are dealing with the commission of a series of illegal acts by agents of the Government. Justice would certainly not countenance a court straining the language of a statute in order to deny the victim of such illegality at least some measure of compensation.

431 F.Supp. at 1361.

In at least one unrelated case, *Black v. United States*, 389 F.Supp. 529 (D.C.D.C. 1975), a plaintiff did recover for an invasion of common law and constitutional rights of privacy, through illegal electronic surveillance, which occurred in 1963, eleven years before the subsection was revised to take *Bivens* and similar cases into account. The court never suggested that an implied exclusion of such claims might exist. It noted that its judgment rested "on theories of trespass, invasion of privacy by intrusion, invasion of privacy by publication, and vio-

lation of Constitutional rights", characterized by the court as "intentional torts." 389 F.Supp. at 531.

■ The straightforward reading of the statute in *Black* is consistent with the general treatment of intentional torts by federal courts in suits against the government. The principle is well-established that parties may sue under the Act for intentional wrongs. The Supreme Court in *Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972), for example, stated that:

> The legislative history [of the Federal Tort Claims Act] indicates that Congress intended to permit liability essentially based on the *intentionally wrongful* . . . conduct of Government employees
>
> . . . . .

406 U.S. at 801, 92 S.Ct. at 1901 (emphasis added). *See also, e. g., Hatahley v. United States,* 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956) (trespass and conversion); *Myers & Myers, Inc. v. United States Postal Service,* 527 F.2d 1252 (2d Cir. 1975) (denial of due process and interference with business opportunity through blacklisting); *Aleutco Corp. v. United States,* 244 F.2d 674 (3d Cir. 1957) (conversion); *Ira S. Bushey & Sons, Inc. v. United States,* 276 F.Supp. 518 (E.D.N.Y.1967), *aff'd,* 398 F.2d 167 (2d Cir. 1968) (trespass); *Palomo v. United States,* 188 F.Supp. 633, 637 (D.Guam 1960) (waste); *United States v. Ein Chemical Corp.,* 161 F.Supp. 238, 246–47 (S.D.N.Y. 1958) (conversion by duress). The government's suggestion that suits for invasions of constitutional rights of privacy are exempt by implication must be rejected.

### B. LIABILITY UNDER NEW YORK TORT LAW

■ Section 1346(b) of the Federal Tort Claims Act, 28 U.S.C. § 1346(b) provides that the United States may be sued for money damages caused by the wrongful act of any employee of the Government "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act . . . occurred." The

"congressional policy underlying the Act . . . is to hold the United States liable under state law principles to the same extent as a similarly situated private individual." *Stencel Aero Engineering Corp. v. United States,* —— U.S. ——, 97 S.Ct. 2054, 2057, 52 L.Ed.2d 665, 669 (1977).

■ Since the opening of mail complained of in these cases occurred at the international mail facility at John F. Kennedy International Airport in New York, the "law of the place where the act or omission occurred" is that of New York. Under the Supreme Court's interpretation of this language, a trial court hearing a federal tort action must look to the whole law of the state where the tort occurred, including that state's law of conflicts. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Ordinarily, therefore, the court would first need to decide whether a New York court would apply its own law since the letters were neither mailed from or to a New York address. This issue need not be decided because the parties have stipulated that the substantive tort law of New York is applicable.

### 1. Common Law Right To Privacy.

Most states recognize invasions of privacy as actionable torts. W. Prosser, Law of Torts § 117 at 804 (4th ed. 1971); 1 F. V. Harper & F. James, The Law of Torts § 9.6 at 682 (1956).

■ In this context, the general rubric "right of privacy" encompasses four concepts. As described by the Restatement (Second) of Torts, they are:

(a) Intrusion upon the seclusion of another . . ., or

(b) Appropriation of the other's name or likeness, . . . or

(c) Publicity given to the other's private life [of a sort which is offensive and not of legitimate public concern], . . . or

(d) Publicity which places the other in a false light before the public. . .

. . . . .

3 Restatement (Second) of Torts, § 625A (1977).

 Intrusion upon the seclusion of these plaintiffs is the branch of privacy involved in these cases. Comments to the Restatement make it plain that the tort is committed whenever an intrusive act is committed, even if the tortfeasor never reveals either the fact of the invasion or any information about the plaintiff to third persons.

The form of invasion of privacy covered by this Section *does not depend upon any publicity given to the person whose interest is invaded,* or to his affairs. It *consists solely of an intentional interference* with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man.

3 Restatement (Second) of Torts, § 652B, Comment a at 378 (1977) (emphasis added). This common law right extends beyond the plaintiff's immediate physical environment and is infringed by examinations of bank accounts or of personal records under false pretenses, or by opening of mail.

The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as where the defendant forces his way into the plaintiff's room in a hotel, or insists over the plaintiff's objection in entering his home. It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars, or tapping his telephone wires. It may be by some other form of investigation or examination into his private concerns, *as by opening his private and personal mail,* searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents.

3 Restatement (Second) of Torts, § 652B, Comment b at 378–79 (1977) (emphasis added). The comment emphasizes that "The

intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the . . . information. . . ." *Id.* at 379. It is apparent, therefore, that, in the majority of states, case law would provide a right to recovery on the facts of these cases.

The law of New York is less clear. This state was the first to consider a case sounding in common law privacy following the publication of a leading article on the subject by Samuel Warren and Louis Brandeis, Warren & Brandeis, The Right To Privacy, 4 Harv.L.Rev. 193 (1890), and its lower courts quickly recognized the doctrine. W. Prosser, Law of Torts § 117 n. 10 at 803 (4th ed. 1971). The New York Court of Appeals at the turn of the century was, however, not yet prepared to accept the doctrine. In *Roberson v. Rochester Folding-Box Company,* 171 N.Y. 538, 64 N.E. 442 (1902)—a case of commercial appropriation where defendant used the photograph of a woman in its advertisements without her permission—the Court by a four to three decision rejected the right to privacy as a distinct and independent tort. It stated that "The so-called right of privacy has not as yet found an abiding place in our jurisprudence". 171 N.Y. at 556, 64 N.E. at 447. The court was careful to note, however, that it was speaking of the developments up to that point—"the doctrine cannot *now* be incorporated" (*id.*) (emphasis supplied)—and not predicting future development. *Roberson's* refusal to recognize commercial appropriations of names, faces and the like as torts was legislatively overruled by sections 50 and 51 of New York's Civil Rights Law, but the general right to privacy has not yet been recognized explicitly by the New York Court of Appeals. Were the question to be placed once more squarely before the Court of Appeals, strong evidence suggests that the court would follow the American "tide . . . in favor of recognition." W. L. Prosser, The Law of Torts § 117 at 804 (4th ed. 1971).

Lower courts in the state have generally continued to acknowledge *Roberson* while

finding ways to avoid it and grant recovery. *See, e. g., Association for Preservation of Freedom of Choice, Inc. v. Emergency Civil Liberties Committee*, 37 Misc.2d 599, 236 N.Y.S.2d 216 (Sup.Ct.1962) (avoiding *Roberson* by applying law of privacy of sister states where some events occurred); *Blair v. Union Free School District No. 6, Hauppauge, Suffolk County*, 67 Misc.2d 248, 324 N.Y.S.2d 222 (Dist.Ct.1971) (avoiding *Roberson* by finding "outrageous" breach of confidence); *Galella v. Onassis*, 487 F.2d 986, 995 n. 12 (2d Cir. 1973) (collecting cases). Addressing the question of the right to privacy in New York, the Second Circuit in *Galella* noted:

> [I]f we were required to reach the question, we would be inclined to agree . . that when again faced with the issue the Court of Appeals may well modify or distinguish its 1902 holding [in *Roberson* ] . . . . There is substantive support today for the proposition that privacy is a "basic right" entitled to legal protection . . . . Privacy essential to individual dignity and personal liberty underlies the fundamental rights guaranteed in the Bill of Rights.

*Id.* (extensive citations omitted).

Numerous statutory enactments in New York support the Second Circuit's view. The provisions which overruled the specific holding of *Roberson* and prohibited commercial appropriations of name or identity have already been mentioned. Article 250 of the New York Penal Law, entitled "Offenses Against The Right To Privacy", includes among the listed crimes illegitimate eavesdropping, wiretapping, unlawful obtaining of communications from telegraph or telephone companies, and—most significantly from the viewpoint of the instant cases—tampering with letters or other "sealed private communication." New York Penal Law § 250.25 illustrates the strength of New York's policy against interference with private communications. It provides in part:

> A person is guilty of tampering with private communications when:

1. Knowing that he does not have the consent of the sender or receiver, he opens or reads a sealed letter or other sealed private communication; or

2. Knowing that a sealed letter or other sealed private communication has been opened or read in violation of subdivision one of this section, he divulges without the consent of the sender or receiver, the contents of such letter or communication, in whole or in part, or a resume of any portion of the contents thereof;

. . . . .

Tampering with private communications is a class B misdemeanor.

■ A federal court, determining the law of the state, cannot blindly follow outmoded case law, but must make a reasoned attempt to determine how the state courts would now decide the issue before it. "Law does change with times and circumstances . . . [L]aw is not restricted to what is found in Law Reports . . . ." *Bernhardt v. Polygraphic Company of America*, 350 U.S. 198, 209–10, 76 S.Ct. 273, 279–80, 100 L.Ed. 199 (1956) (Frankfurter, J., dissenting).

■ The evidence is overwhelming that New York would recognize the common law right of privacy sufficiently to compensate for the kind of intrusion by the government into private mails represented by the instant case.

2. Common Law Copyright and Property Interest in Private Papers.

The New York courts, so far as we have been able to determine, have not had a case directly on point. Nevertheless, the facts before us fit comfortably within the New York common law copyright framework. To understand why this is so, it is necessary to describe at some length the history of legal developments in this esoteric field.

■ Common law copyright reserves to authors the right to control the time and circumstances of the first publication of their works. The right has been important

to artists, professional writers, scholars and others whose intellectual productions have some commercial value. But the doctrine also has been utilized to shield writers of ordinary, nonliterary letters against the misappropriation and nonconsensual publication of their correspondence. *See* Warren & Brandeis, The Right to Privacy, 4 Harv.L. Rev. 193, 198–206 (1890); Hill, Defamation and Privacy Under the First Amendment, 76 Colum.L.Rev. 1205, 1293 n. 416 (1976). In drafting the Copyright Act of 1976, Pub. L.No.94–553, 90 Stat. 2541, Congress explicitly recognized that common law copyright was relied upon by the states to protect a broad range of interests beyond those of the individual in the marketplace value of his work product. Federal law did not preempt state law in those other areas, but acknowledged its continued vitality and capacity for growth. As a relevant congressional report indicated:

> The evolving common law rights of "privacy," "publicity," and trade secrets, and the general laws of defamation and fraud, would remain unaffected [by the codification of common law copyright] as long as the causes of action contain elements, such as invasion of personal rights or a breach of trust or confidentiality, that are different in kind from copyright infringement.

H.R.Rep.No.94–1476, 94th Cong., 1st Sess., 132, reprinted in [1976] U.S.Code Cong. & Ad.News, pp. 5659, 5748.

No one is quite sure when or where the concept of copyright originated. That some legally recognized right to control the publication of books and to protect them from piracy pre-dated the invention of the printing press is suggested by rumors of an Irish case decided in 567 A.D. R. Bowker, Copyright, Its History and Its Law 9 (1912); A. Birrell, The Law and History of Copyright in Books 42 (1899).

When the printing press appeared, the economic interests of book publishers coincided with the political needs of the crown; the Stationers' Company, chartered by Mary Tudor in 1557, assured both that publishers would have the exclusive right to produce and sell the works they published, and that the Crown could censor them. R. Bowker, Copyright, Its History and Its Law 15 (1912). The first statute specifically addressing copyright was not passed, however, until 1709 during the reign of Anne, and it, too, was designed to control the processes of publishing and bookselling rather than to protect authors' rights in unpublished works.

Common law protection of authors who had not published seems to have sprung full grown from the English courts in 1741 to close the gap left by the narrow focus of the copyright statute. In *Pope v. Curl*, 26 Eng.Rep. 608 (Ch.1741), Alexander Pope sued a bookseller who proposed to market a volume of letters written by Pope and other eighteenth century luminaries. The Chancellor enjoined publication on the ground that an author of any letter—be it "learned" or "familiar"—had a common law right to control first publication in the same way that the author of a poem or a treatise could control first publication of those works. Two other early cases (one pre-dating *Pope*) also recognized a protectible property interest in private papers but neither of those opinions are extant. *Webb v. Rose* (1732) (publication of dead person's drafts enjoined) and *Forrester v. Waller* (1741) (publication of surreptitiously-obtained notes enjoined) survive only in the discussion in *Millar v. Taylor*, 98 Eng.Rep. 201, 216 (K.B.1769).

Only one other case involving letters appeared in English case law prior to adoption of the American Constitution. *Thompson v. Stanhope*, 27 Eng.Rep. 476 (Ch.1744) (wife of illegitimate son of Lord Chesterfield cannot publish father's letters to son). Nevertheless, post-Revolutionary American courts continued to refer to contemporaneous English precedents in their effort to define this author's right of common law copyright.

A review of the most important nineteenth and twentieth century case law demonstrates that while common law copyright

may have developed primarily to supplement the economic protections of statutory copyright, it was never solely concerned with the financial interests of authors. Despite some early hesitation, *see, e. g., Perceval v. Phipps*, 35 Eng.Rep. 225 (Ch.1813) (suggestion that publication of private letters with no economic value to author cannot be enjoined), *Wetmore v. Scovell*, 6 N.Y.Ch.Rep. 745 (1842) (applies *Perceval*); *Hoyt v. MacKenzie*, 5 N.Y.Ch.Rep. 917 (1848) (same), courts ultimately and explicitly expanded the theory of common law copyright to encompass a nonpecuniary interest in the privacy of letters.

The landmark English decision was *Gee v. Pritchard*, 36 Eng.Rep. 670 (Ch.1818)—a case cited with approval by the New York Court of Appeals in *Roberson*, 171 N.Y. at 549, 64 N.E. at 445, when rejecting the modern right of privacy but affirming equivalent older concepts based upon property rights. It involved a threat by Pritchard, the illegitimate son of the late Mr. Gee, to publish personal letters Mrs. Gee had written to him. The case distinguished away the seemingly contradictory holding of *Perceval* as one dealing with "consent" of the author to publish, and reaffirmed the conclusion in *Pope* that familiar letters were fully protected by common law copyright. The Chancellor went on to add:

I do not say I am to interfere because the letters are written in confidence, or because publication of them may wound the feelings of the Plaintiff; but if mischievous effects of that kind can be apprehended in cases in which this Court has been accustomed, on the ground of property, to forbid publication, it would not become me to abandon the jurisdiction which my predecessors have exercised, and refuse to forbid it.

36 Eng.Rep. at 678.

The Chancellor's view was adopted by Justice Story in *Folsom v. Marsh*, 9 Fed. Cas. 342 (1st Cir. 1841)—one of the earliest and fullest discussions in American case law of the rights of the author in personal correspondence. No meaningful distinction, Story felt, could be drawn between personal letters and literary works; common law copyright, therefore, must be said to protect both.

Story expounded further on this theme in his treatise on equity jurisprudence, where he eloquently urged that the true value preserved in many instances by the application of common law copyright was not dollars and cents but privacy. His thesis greatly influenced American courts and was explicitly adopted in New York in *Woolsey v. Judd*, 11 Super.Ct. (4 Duer) 379, 11 How.Pr. 49 (N.Y.1855). The court placed its decision squarely on the need of society for a "free interchange," writing:

Our own views and feelings, we do not hesitate to declare, correspond entirely with those which Mr. Justice Story, in the most elaborate and useful of his works, has very forcibly expressed. We agree with him, that the unauthorized publication of [personal] letters, "unless in cases where necessary to the vindication of the rights or conduct of the party against unjust claims or imputations, is perhaps, one of the most odious breaches of private confidence, of social duty, and of honorable feelings which can well be imagined. It strikes at the root of that free interchange of advice, opinions and sentiments, which seems essential to the well-being of society . . . ." (2 Story's Equity Jur. § 946.)

11 Super.Ct. (4 Duer) at 383, 11 How.Pr. at 53–54.

To drive the point home even more sharply that common law copyright is a device by which New York courts protect the privacy interest in the property of a letter, the opinion concluded:

[I]t is with no ordinary satisfaction that, in closing this discussion, we find ourselves in a condition to affirm that the rules of law relative to the publication of private letters, are in perfect harmony with those of social duty and sound morality, and, in the protection which they afford to individuals, consult and promote the highest interests of society.

11 Super.Ct. (4 Duer) at 407, 11 How.Pr. at 79.

The few subsequent New York cases to consider the issue have reaffirmed the theme that common law copyright protects an author's privacy as well as his pocketbook. *In re Ryan's Estate,* 115 Misc. 472, 188 N.Y.S. 387 (Sur.Ct.1921); *Estate of Hemingway v. Random House, Inc.,* 53 Misc.2d 462, 297 N.Y.S.2d 51 (Sup.Ct.), *aff'd,* 29 A.D.2d 633, 285 N.Y.S.2d 568 (1967), *aff'd,* 23 N.Y.2d 341, 296 N.Y.S.2d 771, 244 N.E.2d 250 (1968). *See also Rice v. Williams,* 32 F. 437, 439 (7th Cir. 1887) ("traffic in the letters of third parties, without their knowledge or consent" is "disreputable business" and an abuse of confidentiality); *Dock v. Dock,* 180 Pa.St. 14, 36 A. 411 (Sup.Ct.1897) (in suit for alienation of affections defendant entitled to return of letters stolen by plaintiff); *King v. King,* 25 Wyo. 275, 168 P. 730 (1917) (defendant barred from using letters against author and addressee to disgrace them in a social organization).

■ The doctrine of common law copyright, as accepted in New York and elsewhere, protects plaintiffs Birnbaum and MacMillen. They each wrote a letter which was opened and read, without their permission and without the protections of a particularized warrant, by a third person. The letters were then copied, read by other government agents, and incorporated into the files of the CIA. Although the agency did not publish the letters in the ordinary sense of including them in a book, magazine, pamphlet, or newspaper for public distribution, they did publish them within the meaning of that term for common law copyright purposes. In *In re Ryan's Estate,* 115 Misc. 472, 475, 188 N.Y.S. 387, 389 (Sur. Ct.1921), for example, the court termed the simple act of delivery of letters to the temporary administrator of an estate a "publication." In *Dock,* the Supreme Court of Pennsylvania speaks of an author's right to prevent the "communication [of personal letters] to other persons . . . by the party wrongfully in possession of them." 180 Pa.St. at 22, 36 A. at 412. Similarly, in *King* the offense which concerned the court was not the threat of printing the letters but the threat of showing them to unauthorized persons.

■ The same conclusion follows with respect to Avery, despite the fact that he was the recipient of, rather than the author of, the illicitly opened mail. The law has recognized, for practical reasons, that the recipient, too, has an interest in the letter and certain rights pertaining to it. Were this not so, the addressee of a letter would be unable to exercise the normal kinds of control over his or her mail, including the power to discard a letter once it has been read, or the right to show the letter (except where a breach of confidence might occur) to an interested friend or member of the household. *See, e. g., Baker v. Libbie,* 210 Mass. 599, 97 N.E. 109 (1912); *Folsom v. Marsh,* 9 Fed.Cas. 342 (1st Cir. 1841).

Under some circumstances, the recipient has even been deemed to have a right superior to the author's, enabling him to publish a given letter over the author's objections. As Justice Story recognized in *Folsom*:

> [T]he persons to whom [letters] are addressed, may have, nay, must, by implication, possess, the right to publish any letter or letters addressed to them, upon such occasions, as require, or justify, the publication or public use of them . . . . Thus, a person may justifiably use and publish, in a suit at law or in equity, such letter or letters as are necessary and proper, to establish his right to maintain the suit, or defend the same. So, if he be aspersed or misrepresented by the writer, or accused of improper conduct, in a public manner, he may publish such parts of such letter or letters . . . as may be necessary to vindicate his character and reputation, or free him from unjust obloquy and reproach. . . . In short, the person, to whom letters are addressed, has but a limited right, or special property, (if I may so call it), in such letters, as a trustee, or bailee, for particular purposes, either of information or of protection, or of support of his own rights and character.

9 Fed.Cas. at 346. *Accord, Baker v. Libbie,* 210 Mass. at 605–06, 97 N.E. at 111.

The clear import of common law copyright cases dealing with personal letters, taken as a whole, is that a recipient has a definite property interest in the writing which is also protectable by the courts. The "sound morality" language used by the court in *Woolsey v. Judd,* 11 Super.Ct. (4 Duer) 379, 11 How.Pr. 49 (N.Y.1855), for example, is broad enough to encompass a party in Avery's position. *See also Gee v. Pritchard,* 36 Eng.Rep. 670, 678 (Ch.1818), which calls "the ground of property" a firm enough one on which to support the protection of personal rights.

While one court did refuse to recognize, for lack of any precedent, the right of an addressee of a letter to enjoin publication of the correspondence, it specifically noted that no issue of invasion of privacy had been raised by the plaintiff at trial. *Knights of the Ku Klux Klan v. International Magazine Co.,* 294 F. 661 (2d Cir. 1923). In contrast, the Wyoming state Supreme Court has declined to distinguish between the author and the recipient of personal letters. It found that both had an interest in enjoining a third person from using those letters "willfully, and maliciously, to injure, defame, and humiliate." *King v. King,* 25 Wyo. 275, 281, 168 P. 730, 731 (1917). *Cf. Dock v. Dock,* 180 Pa.St. 14, 36 A. 411 (1897).

The courts' rationale for finding "property" in nonliterary letters has been their concern with preventing violations of confidence and privacy. It is unreasonable to suppose that they would hold that it was only the writer of a letter who could be embarrassed or whose confidence could be breached by its unwarranted exposure.

Particularly in a continuing correspondence between father and son, the child's letter to the parent is likely to refer to, and reveal, the elder's prior remarks. To protect the recipient's rights is, therefore, indirectly to protect him as a writer. The law recognizes this necessary interaction of communicator and communicant, refusing to exclude from its protection one of two actors. It is, for example, this reason that underlies the shielding of advice given by a lawyer to his client as part of a privilege designed to protect the client's communications. *See, e. g.,* McCormick, Evidence § 89 at 182–83 (2d ed. E. W. Cleary, 1972).

This principle of mutuality, recognizing that both writer and recipient have a stake in freedom from interference with their correspondence, was articulated in a recent Supreme Court decision involving censorship of the mails in prisons. The Court pointed out:

> Communication by letter is not accomplished by the act of writing words on paper. Rather, it is effected only when the letter is read by the addressee. Both parties to the correspondence have an interest in securing that result, and censorship of the communication between them necessarily impinges on the interest of each. Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech. And this does not depend on whether the nonprisoner correspondent is the author or intended recipient of a particular letter, for the addressee as well as the sender of direct personal correspondence derives from the First and Fourteenth Amendments a protection against unjustified governmental interference with the intended communication. . . . We do not deal here with difficult questions of the so-called "right to hear" and third-party standing but with a particular means of communication in which the interests of both parties are inextricably meshed.

*Procunier v. Martinez,* 416 U.S. 396, 408–09, 94 S.Ct. 1800, 1809, 40 L.Ed.2d 224 (1974) (citations omitted).

It is not significant that Avery technically had no property interest in the letter at the time it was opened. While, for most purposes, letters do remain the physical property of the author until they are delivered by the Post Office, the addressee in these circumstances has, at the very least, an inchoate property interest sufficient to render his right of privacy protectible.

Any other result would create the anomolous situation where a plaintiff such as Avery could obtain redress if his mail were purloined from his home mailbox by the CIA, photographed, and returned, but could not recover if the very same acts were committed minutes before the post was delivered to his address.

### 3. Violation of Constitutional Rights as Tortious Conduct.

 Violation of plaintiffs' federal constitutional rights is yet a third ground of liability under New York law. New York treats tortious conduct, in violation of the Constitution, by government agents as grounds for recovery of damages.

The illicit mail openings in these cases directly contravene the letter and spirit of the Bill of Rights. The Constitution and the first ten amendments to it created a central government whose powers to encroach upon the personal and political lives of its citizens were carefully limited. Of particular concern to the drafters was protection of ideas—including their tangible embodiment in books and private papers— from interference by public officials.

In England and the Colonies, citizens had been aggrieved by such abusive practices as the use of general warrants to search homes and businesses of British subjects for politically suspect documents. W. Ringel, Searches & Seizures, Arrests and Confessions § 2 at 2–3 (1972). In 1765, one English court proclaimed that if general warrants to search for seditious papers were held valid,

> the secret cabinets and bureaus of every subject in this kingdom will be thrown open to the search and inspection of a messenger, whenever the secretary of state shall think fit to charge, or even to suspect a person to be the author, printer, or publisher of a seditious libel.

*Entick v. Carrington,* 19 State Tr. 1029, 1063 (C.P.1765). The opinion in *Entick* leaves little doubt that the right to protect private papers was recognized as part of the complex of liberties that would be infringed were the government permitted unchecked power to rifle at will through letters, books and other communications:

> Papers are the owner's goods and chattels: they are his dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection; and though the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and carried away, the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that respect. Where is the written law that gives any magistrate such a power? I can safely answer, there is none; and therefore it is too much for us without such authority to pronounce a practice legal, which would be subversive of all the comforts of society.

19 State Tr. at 1066.

 The Supreme Court has long recognized that freedom of speech and the right to be free from unreasonable searches and seizures extends not merely to the person and immediate surroundings of individuals, but to their correspondence as well. In 1878, the Court first applied the Fourth Amendment to letters and sealed packages:

> [They] are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. . . . Whilst in the mail, they can only be opened and examined under . . . warrant . . as is required when papers are subjected to search in one's own household. No law of Congress can place in the hands of officials connected with the postal service any authority to invade the secrecy of letters and . . . sealed packages in the mail. . . .

*Ex Parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1878). *See also* Bloustein, Group Privacy: The Right to Huddle, 8 Rutgers-Camden L.J. 219, 225 (1977). Later cases recognized that First Amendment values were also infringed by "unjustified governmental interference" with personal letters and other mail. *Procunier v. Martinez,* 416 U.S.

396, 409, 94 S.Ct. 1800, 1809, 40 L.Ed.2d 224 (1974). *Cf. Lamont v. Postmaster General of United States,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (refusal to deliver mail deemed by Post Office to be communist propaganda unless addressee formally requests it violates First Amendment); *United States v. Ramsey,* —— U.S. ——, ——, 97 S.Ct. 1972, 1982, 52 L.Ed.2d 617 (1977) (first class mail may not be opened). Given this background, plaintiffs' expectations of privacy in their mail were fully justified.

■ That damages would be available in New York's courts to plaintiffs whose constitutional rights have been violated by public agents is not surprising, but is, rather, implicit in the whole tenor of American jurisprudence. As early as 1803, Chief Justice Marshall wrote in *Marbury v. Madison,* 5 U.S. (1 Cr.) 137, 163, 2 L.Ed. 60:

> The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.

The Supreme Court, in deciding that plaintiffs could recover damages from individual FBI agents for violations of their Fourth Amendment rights, relied upon this language from *Marbury* to support its holding that a "petitioner, if he can demonstrate an injury . . ., is entitled to redress his injury through a . . . remedial mechanism normally available in the federal courts." *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 397, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971). *See also Dellums v. Powell,* 561 F.2d 242 (D.C.Cir.1977) (violation of First Amendment rights). The fact that it is a government official who violates the Constitution is an aggravating, not a mitigating, factor. In *Bivens* the Court wrote:

> Respondents seek to treat the relationship between a citizen and a federal agent unconstitutionally exercising his authority as no different from the relationship between two private citizens. In so doing, they ignore the fact that power, once granted, does not disappear like a magic gift when it is wrongfully used. An agent acting—albeit unconstitutionally—in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own. Accordingly, as our cases make clear, the Fourth Amendment operates as a limitation upon the exercise of federal power regardless of whether the State in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen. It guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority. And "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief."

403 U.S. at 391–92, 91 S.Ct. at 2002 (citations omitted). *Cf.* relying on *Bivens: People v. Feinlowitz,* 29 N.Y.2d 176, 187, 324 N.Y.S.2d 62, 71, 272 N.E.2d 561, 567 (1971) (Burke, J., dissenting), *cert. denied,* 405 U.S. 963, 92 S.Ct. 1175, 31 L.Ed.2d 239 (1972); *Newell v. City of Elgin,* 34 Ill.App.3d 719, 340 N.E.2d 344 (1976); *Cashen v. Spann,* 125 N.J.Super. 386, 311 A.2d 192 (App.Div. 1973), *modified,* 66 N.J. 541, 334 A.2d 8, *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 46 (1975).

■ The New York Court of Appeals shares the general view that plaintiffs are entitled to damages when they are personally harmed by violation of their constitutional rights. In *People v. Defore,* 242 N.Y. 13, 150 N.E. 585 (1926), for example, then-Judge Benjamin Cardozo rejected the exclusionary rule in cases of Fourth Amendment violations by state officials in favor of such alternative remedies available in New York as civil money damages. More recently, in *People v. DeBour,* 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 (1976), the Court of Appeals reiterated its assumption that damages were available in such cases. In discussing limits on the right of police to

approach and question citizens on the streets, the Court wrote:

> The basic purpose of the constitutional protections against unlawful searches and seizures is to safeguard the privacy and security of each and every person against all arbitrary intrusions by government. Therefore, any time an intrusion on the security and privacy of the individual is undertaken with intent to harass or is based upon mere whim, caprice or idle curiosity, the spirit of the Constitution has been violated and the aggrieved party may invoke the exclusionary rule *or appropriate forms of civil redress.* It is in this vein that the defendant urges that his right as a citizen to walk the streets unimpeded by the State has been trammelled.

40 N.Y.2d at 217, 386 N.Y.S.2d at 380–81, 352 N.E.2d at 567–68 (emphasis supplied). *See also* granting damages in situations where constitutional violations occurred: *Frady v. State,* 19 A.D.2d 783, 242 N.Y.S.2d 95 (3d Dep't 1963) (money damages when a state trooper entered home without a warrant); *Herman v. State,* 78 Misc.2d 1025, 357 N.Y.S.2d 811 (Ct.Cl.1974) (money damages when police executed a no-knock warrant for the wrong house); *Casler v. State,* 33 A.D.2d 305, 307 N.Y.S.2d 695 (4th Dep't 1970) (damages awarded for arrest based on search of car without probable cause); *Baisch v. State,* 76 Misc.2d 1006, 351 N.Y. S.2d 617 (Ct.Cl.1974) (damages to plaintiff who had been arrested for "desecrating" the American flag); *Brenon v. State,* 31 A.D.2d 776, 297 N.Y.S.2d 88 (4th Dep't 1969) (damages not awarded because plaintiff had consented to search); *Nader v. General Motors Corp.,* 57 Misc.2d 301, 292 N.Y.S.2d 514 (Sup.Ct.1968) (violation of constitutional right to privacy could be remedied by an award of damages), *aff'd on other grounds,* 31 A.D.2d 392, 298 N.Y.S.2d 137 (1969), *aff'd,* 25 N.Y.2d 560, 307 N.Y. S.2d 647, 255 N.E.2d 765 (1970).

## III. CLASS ACTION INAPPROPRIATE

▮ One of the plaintiffs, Mary Rule MacMillen, moved to certify her suit as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure. The proposed class consisted of all United States residents and citizens whose first-class mail was opened by government agents as part of the HTLINGUAL program and it included both writers and recipients of letters sent into and out of the United States.

The court must find that a class action is superior to other means for a fair and efficient adjudication of the controversy. Specifically it must determine that:

> the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Rule 23(b)(3). Justice would not be served by such certification.

▮ First, the injured here are not easily identified. Although the opening and copying of correspondence without warrant is an undoubted intrusion involving important civil liberties, not all citizens will consider themselves harmed by those acts, or desire any recompense. Some may believe for personal or political reasons that the government—even if it violated the law—should not be sued for actions taken in the name of an arguably legitimate concern for national security. Others may feel that the CIA and the FBI have an absolute right to conduct such security operations and suffer no subjective sense of injury. Still others whose mail was opened may simply feel indifferent about the fact and not, therefore, be damaged in a compensable way.

The issue of class identification is further complicated by the fact that many, if not most, of those affected by HTLINGUAL remain unaware of the fact. Since this is a tort where the individual—as opposed to the public or social—damage flows primarily from the knowledge of the wrong, the bulk of potential class members probably have not been substantially injured.

Second, were this case to be treated as a class action, little practical advantage would accrue to the individual members of the class. All potential plaintiffs share only one question in common: is the United States liable under the applicable federal and state law for harm which may have resulted to any individual from these unauthorized interferences with the mail? Since the facts on which liability—as opposed to damages—rests are undisputed, extensive testimony is not required in each successive case to establish the factual underpinnings of the tort claim. The only question regarding liability will be legal. Future litigants will not be forced to spend large sums to reduplicate complex testimony from numerous witnesses. They will not even bear the burden of preparing extensive, expensive and repetitive briefs since the ultimate determination of the law in this case, assuming that it is followed, will bind future litigants in actions relating to HTLINGUAL. *Cf.* Developments in the Law—Class Actions, 89 Harv.L.Rev. 1318, 1394–1402 (1976).

Third, a class action would present inordinate management problems. Since punitive damages are prohibited by the Tort Claims Act, 28 U.S.C. § 2674, the court could compensate only for actual injuries. The amount of injury could conceivably vary widely from individual to individual, depending on the sensitivity of the letter, the amount of distress experienced, and whether or not any tangible damage could be shown. Since the facts on damages in each case would still have to be determined separately, the court would be enmeshed in a lengthy series of separate trials even if it granted class certification. *Cf. Dellums v. Powell*, 561 F.2d 242 (D.C.Cir. 1977) (dif-

ficulties at trial based on theory of false arrest and imprisonment and violation of First Amendment rights compounded by nature of class).

We need not consider the administrative exhaustion issue requiring the plaintiff in a Federal Tort Claims Act case to attempt first to have his or her claim satisfied by the appropriate administrative agency. 28 U.S.C. § 2675. *Compare McKart v. United States,* 395 U.S. 185, 197, 89 S.Ct. 1657, 1664, 23 L.Ed.2d 194 (1969) (balancing test in Selective Service case); *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 246 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975) (Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*; class may include those who have not filed administrative complaints) *with Commonwealth of Pennsylvania v. National Association of Flood Insurers,* 520 F.2d 11, 24 (3d Cir. 1975) (exhaustion required in class actions brought under Federal Tort Claims Act). If the decision in these cases is upheld on appeal, the CIA may want to reconsider its refusal to grant relief administratively to other HTLINGUAL complainants. Should that be the case, no further cases in this court on the mail openings would be anticipated. If, however, the agency continues to deny claims, a new set of facts will be presented in subsequent actions which may, on appropriate motion, cause the court to reconsider the issue of class certification. *Cf.* Chayes, The Role of the Judge in Public Law Litigation, 89 Harv.L.Rev. 1281, 1294 n. 65 (1976).

## IV. MEASURE OF DAMAGES

### A. Elements Generally

█ Recovery under the Federal Tort Claims Act is limited to compensatory damages. "The United States shall not be liable for . . . punitive damages." 28 U.S.C. § 2674.

█ Neither may the award take into account injuries inflicted upon the structure of American democracy. Any theory which would allow private litigants to seek relief on behalf of the entire injured segment of

the public as private attorneys general has no application in this case for two reasons. First, the effect would be punitive, and hence would contravene the limitation in section 2674. Second, it would make little sense to ask the citizenry as a whole to pay damages to these plaintiffs out of the public purse for injuries which the American population itself has suffered en masse. The remedy for the wrong against the nation, therefore, must be supplied by other branches of government.

The plaintiffs in these cases suffered none of the tangible indicia of harm for which a dollar value may easily be assigned. They experienced no financial losses. Their jobs, their reputations and prestige in their communities did not suffer. They were not subjected to intrusive or humiliating investigations by the government. Their homes were not broken into. They were not assaulted or detained. They lost no time from work and incurred no medical expenses. Plaintiff MacMillen did testify that she broke out in hives and suffered some respiratory difficulties shortly after she learned of the CIA action, but even she did not claim damages for physical injury or medical bills.

■ The lack of objective harm is, however, no bar to recovery. The law generally recognizes that where a person suffers an invasion of the right to privacy, awards are appropriate for general damages covering the injury of invasion itself, as well as for the resulting mental distress. The Restatement (Second) of Torts, § 652H, summarizes the rule in privacy cases:

> One who has established a cause of action for unreasonable invasion of his privacy is entitled to recover damages for
>
> (a) the harm to his interest in privacy resulting from the invasion;
>
> (b) his mental distress proved to have been suffered if it is of a kind which normally results from such an invasion; and
>
> (c) special damage of which the invasion is a legal cause.

3 Restatement (Second), Section 652H at 401 (1977).

■ New York has been extremely liberal in granting recovery for mental distress, both as an interest protectible in itself, *see, e. g., Long v. Beneficial Finance Co. of New York,* 39 A.D.2d 11, 330 N.Y. S.2d 664 (4th Dep't 1972), and as an element of damages for other torts such as defamation or false imprisonment. *See, e. g., Bishop v. New York Times Co.,* 233 N.Y. 446, 135 N.E. 845 (1922) (defamation); *Hoffner v. State,* 207 Misc. 1070, 142 N.Y.S.2d 630 (Ct.Cl.1955) (false imprisonment). It is also an element of damages in civil suits for constitutional violations. *See Herman v. State,* 78 Misc.2d 1025, 357 N.Y.S.2d 811 (Ct.Cl.1974). Although appropriate damages for common law copyright are rarely discussed, because most litigants have sought injunctive relief, there is no reason to suppose that allowance would not be made for mental anguish since New York courts grant this remedy in other cases where privacy-related interests are at stake.

■ The court credits the testimony of the plaintiffs in these cases that they suffered actual mental pain, outrage and shock when they learned that government agents had interfered with their privacy by opening and reading their mail. They are entitled, therefore, to recovery for that injury under any of the three tort theories supporting liability.

The parties are entitled to recover for the invasion of their rights, without respect to the consequences. The Restatement (Second) of Torts suggests that a deprivation of common law privacy is an independent injury for which damages are appropriate. The comment to the damages section of the Restatement notes:

> A cause of action for invasion of privacy, in any of its four forms, entitles the plaintiff to recover damages for the harm to the particular element of his privacy which is invaded. Thus one who suffers an intrusion upon his solitude or seclusion . . . may recover damages for the deprivation of his seclusion. One to whose private life publicity is given . . may recover for the harm resulting to his

reputation from such publicity. One who is publicly placed in a false light . . may recover damages for the harm to his reputation from the position in which he is so placed. One whose name, likeness or identity is appropriated to the use of another . . . may recover for the loss of the exclusive use of the value so appropriated.

3 Restatement (Second) of Torts, § 652H, Comment at 401–02 (1977). A similar rule applies also to damages for constitutional torts. *See, e. g., Piphus v. Carey,* 545 F.2d 30, 31–32 (7th Cir. 1976) (appeal pending).

Valuation of intangibles is difficult, but not impossible. In ordinary tort suits, judges and juries commonly draw upon the evidence and their shared experience to assess the dollar worth of such imponderables as future pain and suffering. Over time, a range of awards appropriate for certain kinds of losses is established, enabling courts to decide whether a given recovery is reasonable. In this case, however, no precedents are available. For this reason the court decided to seek the assistance of an advisory jury.

### B. Advisory Jury Recommendations

██ While trial by jury is specifically prohibited in Federal Tort Claims Act cases, 28 U.S.C. § 2402, use of an advisory jury is permitted. *Coffland v. United States,* 57 F.R.D. 209 (N.D.W.Va.1972); *Poston v. United States,* 262 F.Supp. 22 (D.Haw. 1966), *aff'd,* 396 F.2d 103 (9th Cir.), *cert. denied,* 393 U.S. 946, 89 S.Ct. 322, 21 L.Ed.2d 285 (1968), *rehearing denied,* 393 U.S. 1072, 89 S.Ct. 724, 21 L.Ed.2d 717 (1969); *Schetter v. Housing Authority of City of Erie,* 132 F.Supp. 149 (W.D.Pa.1955). *Contra, Honeycutt v. United States,* 19 F.R.D. 229 (W.D.La.1956). The verdict of such an advisory panel is only part of the data taken into consideration in arriving at the court's independent conclusion.

It was, nevertheless, instructive that this panel of average citizens—representing a broad range of economic, educational, social and political experience—uniformly found that the damages suffered by the plaintiffs in this case were substantial. Although the jurors were instructed that they could recommend nominal damages of one dollar if they found that the wrong done resulted only in slight harm, none chose this alternative. Three suggested that plaintiffs be awarded $10,000 each for their mental distress and for the encroachment upon their personal liberty; one suggested $2500; and the other eight jurors all agreed that $5000 was the compensation needed to make these plaintiffs whole.

In addition, the verdict of the advisory panel served to affirm the opinion of the court that the emotional distress these plaintiffs suffered was the sort that would be experienced by reasonable people under the almost unprecedented circumstances of these cases. Since normal principles of tort recovery in privacy do not permit compensation for unusual sensitivity, the consensus of the jurors on this point was particularly useful. The Restatement (Second) of Torts provides that:

> The plaintiff [who has established a cause of action for invasion of his privacy] may also recover damages for emotional distress . . . if it is of a kind that *normally* results from such an invasion and . . . is normal and reasonable in its extent.

3 Restatement (Second) of Torts, § 652H, Comment b at 402 (1977) (emphasis added). It should also be noted that the jury did not find any difference in the degree of damage sustained by any of the three plaintiffs.

### C. Court Findings

██ The court's findings on the damages issue agree substantially with those of the jury. The injuries suffered were substantial. It is entirely reasonable and normal for any citizen whose privacy has been invaded by the government, as it was in these cases, to experience comparable emotional distress. All three plaintiffs should be treated similarly in the absence of substantial proof that any one suffered perceptibly more than the others. Although plaintiff MacMillen's letter was more personal than those of the other plaintiffs, there was insufficient evidence that she suffered enough incremental embarrassment to justify a higher award.

The jurors' damage recommendations were somewhat high. Awards of the magnitude suggested by the advisory verdict have been found only where plaintiffs have suffered objective, observable injuries as a result of interferences with their civil liberties. *See, e. g., Donovan v. Reinbold*, 433 F.2d 738 (9th Cir. 1970) ($5000 for loss of job because of the exercise of First Amendment rights); *Manfredonia v. Barry*, 401 F.Supp. 762 (E.D.N.Y.1975) ($3500 damages upon a finding that rights under the Fourth and First Amendments had been violated; plaintiff spent the night in jail, and was exposed to extensive notoriety in the press and her community); *Zarcone v. Perry*, 75–C–1619 (E.D.N.Y.July 20, 1977) (damage award of $141,000 for false arrest and imprisonment with handcuffing of the plaintiff, public humiliation and proof of substantial medical expenses and economic loss and substantial punitive damages). *Cf. Dellums v. Powell*, 561 F.2d 242 (D.C.Cir. 1977) ($7500 excessive for First Amendment violations).

In the instant case it is possible to ameliorate the harm by the government's writing a letter of apology, a possibility raised by the jury. Assurance by the government that it regrets the injury to plaintiffs will serve to soothe their wounded faith in our democratic institutions, give assurances of non-recurrence in the future, and restore some confidence in our government. In analogous defamation cases, New York law recognizes that an apology will mitigate damages, or at least that a failure to apologize will enhance them. *See, e. g., Stefania v. McNiff*, 49 Misc.2d 480, 267 N.Y.S.2d 854 (Sup.Ct.1966); *O'Connor v. Field*, 266 App. Div. 121, 41 N.Y.S.2d 492 (1st Dep't 1943); *O'Leary v. Hearst Magazines, Inc.*, 167 Misc. 481, 4 N.Y.S.2d 79 (Sup.Ct.1937), *aff'd*, 254 A.D. 806, 5 N.Y.S.2d 538, *aff'd*, 280 N.Y. 502, 19 N.E.2d 917 (1938). *See also* W. Prosser, Law of Torts § 116 at 800 (4th ed. 1971); 1 F. V. Harper & F. James, The Law of Torts 408–09 (1956). It is appropriate to apply these precedents to the special facts of this case.

In arriving at an appropriate figure some guidance is found in the amount declared by Congress as proper compensation in a similar context. Under the Omnibus Crime Control and Safe Streets Act of 1968, P.L. 90–351, Congress created a right to civil recovery for individuals whose telephone or oral conversations were intercepted without legal sanction by wiretaps or eavesdropping. The basic damage figure was set at $100 a day, or $1000, whichever is larger; special damages, punitive damages and attorney's fees are also recoverable. 18 U.S.C. § 2520. Since the interests sought to be vindicated in these CIA cases and by the Omnibus Crime Control Act provisions are similar, comparability in the size of the non-punitive awards seems reasonable, even though it is the state rather than the federal law of damages that is being applied.

These considerations, as well as the documentary and testimonial evidence, lead to a conclusion that plaintiffs should recover for the violations they suffered, and for the mental distress which followed, in the sum of $1000 each, provided the government furnishes a suitable letter of regret and assurance of non-recurrence. Of the $1000, twenty-five per cent is to be paid to the counsel for these plaintiffs as attorney's fees. While this legal fee clearly does not compensate the plaintiffs' talented lawyers for the time devoted to these cases, it is the maximum permitted by statute. 28 U.S.C. § 2678. In addition to the $1000 in compensatory damages, plaintiffs are also entitled to recover costs. 28 U.S.C. § 2412.

## V. CONCLUSION

The American people have already paid a considerable price for the CIA's illegal mail search activities. In addition to the large out-of-pocket expenditures in operating the program, there has been a perceptible widespread loss of confidence in the integrity of the mails and in the right of individuals to be free from surreptitious intrusions into their privacy by government officials. Adding to the taxpayers' burdens by awarding damages in these cases may seem like a regrettable additional disbursement for this ill-starred program. But the law requires that plaintiffs be compensated for their special loss. Moreover, knowledge by

government officials that individuals have effective legal remedies to enforce their rights may deter future illegality. The existence of a court system capable of protecting the right to privacy by granting money damages and other relief against the government and its agents makes our Constitution and laws consequential to our citizens rather than pretentious, empty promises.

The court finds that the United States government, through its agents, committed torts against plaintiffs, causing compensable injury. Each plaintiff shall have judgment for $1000 plus costs.

So ordered.