

Brown, Chief Judge, and Coleman, Ainsworth, Morgan, Roney, Gee, Hill, Fay and Rubin, Circuit Judges, joined in opinion of Vance, Circuit Judge.

Simpson, Circuit Judge filed dissenting opinion in which Gewin, Goldberg and Godbold, Circuit Judges, joined.

Charles Clark, Circuit Judge, filed specially concurring opinion in which Tjoflat, Circuit Judge, joined.

Coleman, Circuit Judge, filed specially concurring opinion.

Gee, Circuit Judge, filed specially concurring opinion.

Alvin B. Rubin, Circuit Judge, filed concurring opinion.

**Robert PUGH and Nathaniel Henderson et al., Plaintiffs-Appellants,**

v.

**James RAINWATER et al., Defendants-Appellees.**

**No. 72–1223.**

United States Court of Appeals, Fifth Circuit.

May 10, 1978.

Bennett H. Brummer, Public Defender, Eleventh Judicial Circuit of Fla., Bruce S. Rogow, Miami, Fla., for plaintiffs-appellants.

Peter L. Nimkoff, Daniel S. Pearson, Louis M. Jepeway, Jr., Miami, Fla., for Dade County Bar.

Robert L. Shevin, Atty. Gen., Raymond L. Marky, Asst. Atty. Gen., Tallahassee, Fla., Paul H. Zacks, Asst. Atty. Gen., West Palm Beach, Fla., for Sutton, Rainwater, Ferguson, Adair, Snowden & Berkman.

Ralph Frank Miles, City Atty., for City of Hialeah, Hialeah, Fla., for Maynard.

Aaron Foosaner, North Miami Beach, Fla., for Perry.

Joseph Pardo, Miami, Fla., for Segall.

Jack Blumenfeld, Milton Robbins, Asst. State's Attys., Miami, Fla., for Gerstein.

Joseph A. Wanick, City Atty., and Henry A. Edgar, Jr., Asst. City Atty., Miami Beach, Fla., for Pomerance.

Alan H. Rothstein, Miami, Fla., for Bernard Garmire.

Larry J. Hirsch, Asst. City Atty., Montague Rosenberg, Asst. City Atty., Miami, Fla., Paul H. Zacks, Asst. Atty. Gen., West Palm Beach, Fla., for Bernard Garmire.

Before BROWN, Chief Judge, and GEWIN, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, SIMPSON, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN and VANCE, Circuit Judges.[*]

VANCE, Circuit Judge:

The panel opinion, 557 F.2d 1189, traces the complicated history of this litigation.[1] Before the Court on rehearing en banc is plaintiffs' contention and the panel's holding that Florida Rule of Criminal Procedure 3.130(b)(4), does not pass constitutional muster. The rule was adopted by the Supreme Court of Florida while the case was pending in this Court. Effective on July 1, 1977 it established the pretrial bail system which is the present successor to the bail practices upheld by the Southern District of Florida in the judgment from which this appeal originally was taken.

The new rule[2] enumerates six forms of release which come within the definition of bail in non-capital cases. Number five is the posting of a bail bond with sureties or the deposit of cash in lieu thereof. It is

---

[*] Due to illness, Thornberry, Circuit Judge, did not participate in this decision.

[1] "In 1971, the plaintiffs brought a class action against eight judges and other state officials including the State Attorney, Richard Gerstein, of Dade County, Florida, asking the federal district court to declare unconstitutional and to enjoin two practices of the defendants: (1) pretrial detention of arrestees without a judicial determination of probable cause, and (2) pretrial detention of indigent defendants solely because they were unable to post money bail as a condition of release. The trial court held for the plaintiffs on the first charge and for the defendants on the second. *Pugh v. Rainwater*, 332 F.Supp. 1107 (S.D.Fla.1971). The State Attorney, Richard Gerstein, appealed on the probable cause question and the plaintiffs appealed on the bail question by separate appeals to this court. After oral argument, we remanded (by an unpublished order) for further findings on the probable cause issue and the district court reaffirmed its original ruling. *Pugh v. Rainwater*, 355 F.Supp. 1286 (S.D.Fla.1973). We then affirmed on the probable cause issue with modifications. *Pugh v. Rainwater*, 483 F.2d 778 (5th Cir. 1973). After defendant Gerstein petitioned the Supreme Court for certiorari, we issued an order holding the bail issue in abeyance pending the Supreme Court's decision. The Court affirmed with modifications our holding on the probable cause issue. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

"On November 11, 1975, we held oral arguments on the bail aspect of this case. At that time we suggested that counsel give the Supreme Court of Florida an opportunity to revise its rule of criminal procedure regarding pretrial release, thus obviating the need for action by this Court. The Florida Supreme Court had earlier rejected an amendment to its criminal rules that would have accommodated the plaintiffs' wishes. *In re Florida Rules of Criminal Procedure*, 272 So.2d 65 (Fla.1972). On several occasions after the 1975 oral argument, plaintiffs' attorneys presented their case to the Florida Supreme Court and to appropriate committees of the integrated Florida Bar. Finally, the Florida Supreme Court promulgated a new rule concerning bail, *The Florida Bar re Florida Rules of Criminal Procedure*, 343 So.2d 1247 (Fla.1977) (Fla.R.Crim.P. 3.130), Note 11, *supra*, but declined to adopt the specific revisions requested by the plaintiffs."

[2] "Rule 3.130. Pre-trial Release

(a) Offenses Less Than Capital. All persons in custody for the commission of an offense unless it is a capital offense or an offense punishable by life imprisonment and the proof of guilt is evident or the presumption is great shall be entitled as of right to be admitted to bail before conviction. After conviction bail may be granted by either the trial or appellate court.

(b) First Appearance
\* \* \* \* \* \*

(4) Hearing at First Appearance.
(i) The purpose of bail is to insure the defendant's appearance. For the purpose of this rule, bail is defined as any of the following forms of release:

urged that in the case of indigents, equal protection standards require a presumption against money bail and favoring the other enumerated forms of release.[3] The panel held that Florida's new rule is constitutionally defective by reason of its failure to express such a presumption. We disagree.

■ At the outset we accept the principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible. *Williams v. Illinois*, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970); *Tate v. Short*, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971). The punitive and heavily burdensome nature of pretrial confinement has been the subject of convincing commentary.[4] We view such deprivation of liberty of one who is accused but not convicted of crime as presenting a question having broader effects and constitutional implications than would appear from a rule stated solely for the protection of indigents.

(1) Personal recognizance of the defendant;
(2) Execution of an unsecured appearance bond in an amount specified by the judge;
(3) Placing the defendant in the custody of a designated person or organization agreeing to supervise him;
(4) Placing restrictions on the travel, association, or place of abode of the defendant during the period of release;
(5) Requiring the execution of a bail bond with sufficient solvent sureties, or the deposit of cash in lieu thereof; or
(6) Imposing any other condition deemed reasonably necessary to assure appearance as required, including a condition requiring that the defendant return to custody after specified hours.
(ii) The judge shall at the defendant's first appearance consider all available relevant factors to determine what form of release is necessary to assure the defendant's appearance. If a monetary bail is required, then the judge shall determine the amount.
(iii) In determining which form of release will reasonably assure appearance, the judge shall, on the basis of available information, take into account the nature and circumstances of the offense charged, the weight of the evidence against the defendant, the defendant's family ties, employment, financial resources, character and mental condition, the length of his residence in the community, his record of convictions, and his record of appearance at court proceedings or of flight

■ Resolution of the problems concerning pretrial bail requires a delicate balancing of the vital interests of the state with those of the individual. Florida has a compelling interest in assuring the presence at trial of persons charged with crime.[5] Yet such individuals remain clothed with a presumption of innocence and with their constitutional guarantees intact. The Supreme Court speaking through Chief Justice Vinson observed in *Stack, et al. v. Boyle, United States Marshal*, 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951):

"From the passage of the Judicial Act of 1789, 1 Stat. 73, 91, to the present Federal Rules of Criminal Procedure, Rule 46(a)(1) [18 U.S.C.A.] federal law has unequivocally provided that a person arrested for a non-capital offense *shall* be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of

to avoid prosecution or failure to appear at court proceedings."

3. Plaintiffs stop short of the logical extension of this argument: that money bail is a per se denial of equal protection to indigents. The expressed presumption for which they contend thus would not avoid pretrial detention of a certain number of indigent persons accused of bailable offenses, who cannot meet any of the requirements for release. They would still be jailed while non-indigents in an otherwise equivalent position remain free.

4. See for example: Wisotsky, *Use of a Master Bond Schedule: Equal Justice Under Law?*, XXIV University of Miami L.Rev. 808 (1970); *The Unconstitutional Administration of Bail: Bellamy v. The Judges of New York City*, 8 Criminal Law Bulletin 459 (1972); Note, *Bail and Its Discrimination Against the Poor: A Civil Rights Action as a Vehicle of Reform*, 9 Valparaiso University L.Rev. 167 (1974).

5. Fla.R.Crim.P. 3.130(b)(4)(i) provides: "The purpose of bail is to insure the defendant's appearance." We do not reach the distinct but related question as to what circumstances, if any, justify the denial of bail before trial in non-capital cases involving defendants who allegedly present a threat to particular persons or society in general—the so called "preventive detention doctrine."

punishment prior to conviction. See. *Hudson v. Parker*, 1895, 156 U.S. 277, 285 [15 S.Ct. 450, 39 L.Ed. 424] (1895). Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.

"The right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty. *Ex parte Milburn*, 1835, 9 Pet. 704, 710 [9 L.Ed. 280] (1835). Like the ancient practice of securing the oaths of responsible persons to stand as sureties for the accused, the modern practice of requiring a bail bond or the deposit of a sum of money subject to forfeiture serves as additional assurance of the presence of an accused. Bail set at a figure higher than an amount reasonably calculated to fulfill this purpose is 'excessive' under the Eighth Amendment. See *United States v. Motlow*, 10 F.2d 657 (1926, opinion by Mr. Justice Butler as Circuit Justice of the Seventh Circuit).

"Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant. * * * "

In another context the rule was established in *Rhem v. Malcolm*, 507 F.2d 333, 336 (2d Cir. 1974), that:

"The demands of equal protection of the laws and of due process prohibit depriving pre-trial detainees of the rights of other citizens to a greater extent than necessary to assure appearance at trial and security of the jail; * * * "

See to the same effect: *Taylor v. Sterrett*, 532 F.2d 462 (5th Cir. 1976); *Duran v. Elrod*, 542 F.2d 998 (7th Cir. 1976); *United States, ex rel. Tyrrell v. Speaker*, 535 F.2d

823 (3rd Cir. 1976). Such requirement as is necessary to provide reasonable assurance of the accused's presence at trial is constitutionally permissible. Any requirement in excess of that amount would be inherently punitive and run afoul of due process requirements.

■ The argument favoring a specified priority sequence for the various forms of release overlooks the fact that its impact may vary under varying circumstances. By definition an indigent is incapable of meeting any money bail requirement. Similarly disfavored is the non-indigent whose money bail is set in an amount higher than he can provide. Money bail, however, may not be the most burdensome requirement in all cases. A moneyed visitor in a city far removed from his home might find certain of the alternative forms of release infinitely more onerous. Utilization of a master bond schedule[6] provides speedy and convenient release for those who have no difficulty in meetings its requirements. The incarceration of those who cannot, without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements.

■ Rules under which personal liberty is to be deprived are limited by the constitutional guarantees of all, be they moneyed or indigent, befriended or friendless, employed or unemployed, resident or transient, of good reputation or bad.

The ultimate inquiry in each instance is what is necessary to reasonably assure defendant's presence at trial. Systems which incorporate a presumption favoring personal recognizance avoid much of the difficulty inherent in the entire subject area. A mechanical consideration of priorities among various other modes of release may conform to constitutional requirements.[7] We per-

---

6. The term as here used refers to a schedule with the amount of a bond specified for each listed offense. It contemplates that each accused's pretrial money bail is to be set automatically on the basis of the offense charged.

7. Plaintiffs thus suggest that the approach of the Bail Reform Act of 1966, 18 U.S.C., Sec. 3146 (1970) is mandatory if invidious discrimination against a class of persons who cannot make money bail is to be avoided.

ceive no reason, however, why less explicit requirements may not be applied in an altogether constitutional manner. We have no doubt that in the case of an indigent, whose appearance at trial could reasonably be assured by one of the alternate forms of release, pretrial confinement for inability to post money bail would constitute imposition of an excessive restraint. We do not read the State of Florida's new rule to require such a result.

It is here that we reach a fundamental point of departure from the panel's decision. The Supreme Court of Florida twice declined to incorporate a presumption against money bail as a part of its rule. It is argued that we therefore should conclude that a contrary result was intended, that the automatic setting of money bails will continue and that the unnecessary and therefore constitutionally interdicted pretrial detention of indigents will be the inevitable result.

█ We doubt that the Florida Supreme Court's failure to express such a presumption necessarily imputes to it a design thus to circumvent constitutional requirements. Its rule mandates that "all relevant factors" be considered in determining "what form of release is necessary to assure the defendant's appearance." If the same "is required" to accomplish that result, the rule provides that the judge will determine the amount of a monetary bail. Rule 3.130(b)(4) is new. The record before us reflects neither its interpretation nor application by the courts of Florida. If it is possible to do so, Rule 3.130(b)(4) is due to be construed so as to avoid constitutional infirmity. *New York Times Company, et al v. Conner,* 291 F.2d 492 (5th Cir. 1961); *U. S. v. Boerner,* 508 F.2d 1064 (5th Cir. 1975),

cert. den. 421 U.S. 1013, 95 S.Ct. 2418, 44 L.Ed.2d 681. Courts do not consider a tendered constitutional question if the contended for result can be reached by statutory interpretation. *Hagans, et al v. Lavine, Commissioner, New York Department of Social Services, et al,* 415 U.S. 528, 546, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Benton-Volve-Metairie, Inc. v. Volvo Southwest, Inc.,* 479 F.2d 135 (5th Cir. 1973); *Tolg v. Grimes,* 355 F.2d 92 (5th Cir. 1966). It is our view that as now written, the rule is subject to constitutional interpretation and application.[8]

█ The record before the Court contains only evidence of practices under criminal procedures which predate the adoption of the current Florida rule. Our review must be in the light of the Florida rule as it now stands, not as it stood when the judgment below was entered. *Kremens v. Bartley,* 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977); *Diffenderfer, et al v. Central Baptist Church of Miami, Florida, et al,* 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed.2d 567. As an attack on the Florida procedures which existed as of the time of trial, the case has lost its character as a present, live controversy and is therefore moot. *Kremens v. Bartley, supra; Diffenderfer v. Central Baptist Church, supra; Hall v. Beals,* 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969); Wright, Miller & Cooper, Federal Practice and Procedure: Mootness, Sec. 3533.

█ We have determined that on its face Rule 3.130(b)(4) does not suffer such infirmity that its constitutional application is precluded. Further adjudication of the merits of a constitutional challenge addressed to it should await presentation of a proper record reflecting application by the courts of the State of Florida. *Carey, Gov-*

---

8. The Committee Note to Rule 3.130, 343 So.2d 1251, provides:

"This proposal leaves it to the sound discretion of the judge to determine the *least onerous form of release* which will still insure the defendant's appearance." (Emphasis added) The panel rejected this analysis, pointing out that committee notes were not adopted by the

Supreme Court of Florida and that nothing in the rule requires a judge to give priority to forms of release that do not impose a financial burden. The validity of the committee's thesis is enhanced, however, by the absence of a constitutional alternative.

*ernor of New York, et al v. Sugar, et al*, 425 U.S. 73, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976); *Socialist Labor Party, et al v. Gilligan, Governor of Ohio, et al*, 406 U.S. 583, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972); *Railroad Commission of Texas, et al v. Pullman Company, et al*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

 Our decision is that the portion of the district court's Opinion and Final Judgment which was challenged by plaintiffs' separate appeal was rendered moot by Florida's adoption of Rule of Criminal Procedure 3.130(b)(4). We hold that the new Florida rule is not facially unconstitutional and we abstain from its further consideration. It follows that the decision of the panel is due to be vacated. In order that the bail portion of the district court's Opinion and Final Judgment of October 12, 1971 will have no precedential effect, we vacate the portion concerning Count III of plaintiffs' complaint (the bail count)[9] and remand with directions that Count III of said complaint be dismissed as moot[10] without costs to either party.

OPINION AND FINAL JUDGMENT OF DISTRICT COURT VACATED IN PART. CASE REMANDED WITH DIRECTIONS.

SIMPSON, Circuit Judge, with whom GEWIN, GOLDBERG and GODBOLD, Circuit Judges, join, dissenting:

Today's en banc majority has lost sight of the single question in this case, the narrow issue decided by the panel: Whether the equal protection clause of the Fourteenth Amendment entitles indigent pretrial detainees to a presumption against the imposition of money bail to secure their appearance at trial. The panel answered this question affirmatively, holding that the current Florida bail rule, which, like all its predecessors, fails to incorporate such a presumption, is unconstitutional in that respect. *Pugh v. Rainwater,* 557 F.2d 1189 (5th Cir. 1977). But the en banc majority, its vision beclouded by issues not presented and theories of abstention peculiarly inappropriate here, misses the whole point of the case. Ultimately it abdicates its responsibility to decide fundamental constitutional questions ripe for adjudication. I dissent.

I shall attempt briefly to delineate the manner in which I deem the majority to have strayed from the proper course.

## I. THE ISSUE

As relevant to this appeal, this case is a class action brought on behalf of indigent persons who have been detained prior to trial because they could not afford to pay money bail. The issue raised by the plaintiffs is whether the setting of money bail for indigents—under a system that does not require a presumption against money bail in the case of indigents—violates Fourteenth Amendment equal protection. See 557 F.2d at 1194–95, 1201–02.

By some process of reasoning not apparent, the majority has transformed this narrow issue into a broad, hypothetical question encompassing *all* rights, not simply equal protection rights, of *all* persons, not limited to indigents. Thus the majority writes, "[w]e view such deprivation of liberty of one who is accused but not convicted of crime as presenting a question having broader effects and constitutional implications than would appear from a rule stated solely for the protection of indigents". Majority opinion, at 1056.[1] Then, in address-

---

**9.** The portion referred to consists of all of the paragraph found on page 14 of the Opinion and Final Judgment (332 F.Supp. 1115) beginning with the words: "Plaintiffs contend in count III . . . ." together with all of the next succeeding paragraph.

**10.** We conclude that this disposition is the appropriate application of the prior practice of this court. *National Lawyers Guild U. of Tex.*

*Ch. v. Board of Regents,* 490 F.2d 97 (5 Cir. 1974); *United States v. West Gulf Maritime Association,* 460 F.2d 1231 (5 Cir. 1972); *Troy State University v. Dickey,* 402 F.2d 515 (5 Cir. 1968).

**1.** Had the majority not voted to abstain and, instead, reached the merits, it would have been constitutionally limited to a ruling "stated solely for the protection of indigents". No plaintiff

ing the panel's holding, the majority notes "[t]he argument favoring a specified priority sequence for the various forms of release overlooks the fact that its impact may vary under varying circumstances", explaining that forms of pretrial release other than money bail may disfavor persons with problems other than indigency. Majority opinion, at 1057. Finally, the Court today states: "Rules under which personal liberty is to be deprived are limited by the constitutional guarantees of all, be they moneyed or indigent, befriended or friendless, employed or unemployed, resident or transient, of good reputation or bad". Id. at 1057. Noble as these sentiments may be, they deflect the majority entirely from the true targets of this lawsuit, indigents and money bail.[2]

Similarly, the majority skirts the equal protection issue by offering gratuitous observations about constitutional rights not invoked by the plaintiffs. We are told that "[a]ny requirement in excess of" the amount necessary to provide reasonable assurance of the accused's presence at trial "would be inherently punitive and run afoul of due process requirements", id. at 1057, and that in certain cases, pretrial confinement of indigents "for inability to post money bail would constitute imposition of an excessive restraint". Id. at 1058. Indeed, the majority agrees with the panel that "incarceration of those who cannot [afford money bail], without meaningful consideration of other possible alternatives, infringes on both due process *and equal protection* requirements", id. at 1057 (emphasis added), but then summarily and without explanation rejects the panel's further qualification that equal protection demands a

presumption against money bail in the case of indigents.

## II. THE IMPACT OF FLORIDA'S NEW BAIL RULE

The en banc majority posits that the revision of the Florida bail rule which took place during the pendency of this appeal has mooted the district court's decision and requires that we abstain from "further consideration" of the rule. To be sure, the new rule has had a significant impact on the non-indigent, non-money bail, non-equal protection hypothetical cases about which the majority speculates. It has not, however, had an impact on the equal protection rights of indigents—the sole concern of this case—sufficient to render the district court's decision moot or to warrant abstention. In reality, the law governing the setting of bail for indigents remains the same today—after two revisions of the Florida Rules of Criminal Procedure—as it was when this suit was filed over seven years ago.

The majority notes that the latest revision of the Florida bail rule mandates that "all relevant factors" be considered in determining "what form of release is necessary to assure the defendant's appearance". "If a monetary bail is required, then the judge shall determine the amount". Fla.R. Crim.P. 3.130(b)(4)(ii) (1977). In explaining that this rule is capable of construction consistent with constitutional requirements, the majority states, "[t]he ultimate inquiry in each instance is what is necessary to reasonably assure defendant's presence at trial". Majority opinion, at 1057. The rule also provides that "[i]n determining which

in this case had standing to represent the interests of any class except indigents. See 557 F.2d at 1190 n. 1. Any language purporting to determine the rights of persons other than indigents would have been dicta since federal courts lack power to decide "abstract propositions" which "cannot affect the rights of litigants in the case before them". *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971).

**2.** The ancient lament of Martial, the Roman philosopher, is apropos:

This is not a case of murder nor assault nor poison. It's a case involving three goats. I claim that my neighbor stole them and the court wants the accusation proved. You keep telling us about the battle of Cannae, the war with Mithridates, the furious struggle with the perfidious Carthaginian, about Sulla, Marius and the like. And all with a roar and a waving of hands. Don't you think it's about time, Postumus, that you talked about those three goats?
Epigrams, VI, 19.

form of release will reasonably assure appearance, the judge shall, on the basis of available information, take into account the nature and circumstances of the offense charged, the weight of the evidence against the defendant, the defendant's family ties, employment, financial resources, character and mental condition, the length of his residence in the community, his record of convictions", and other comparable factors.

Seven years ago, the district court in this case made findings of fact which make apparent that the 1977 rule merely codifies the 1971 practice:

> The record establishes that it is the policy of defendants to set bonds sufficiently low to allow accused persons their release while assuring their subsequent appearance at trial. The severity of the crime along with the accused's ties to the community, past criminal record, and financial resources are all considered in the setting of bonds. There is no allegation that any bond in question was set in excess of that which the judicial officer deemed necessary to assure trial appearance.

*Pugh v. Rainwater*, 332 F.Supp. 1107, 1115 (S.D.Fla.1971). The authority of Florida courts to condition pretrial release on nonfinancial factors was recognized long before the promulgation of the 1972 and 1977 rules. Cf. Fla.Stat. 903.03(2)(a)(3). Similarly, it had long been the law in Florida that "[j]udicial officers charged with the responsibility of fixing bail are bound by the Constitution to fix bail in a not excessive amount". *Matera v. Buchanan,* 192 So.2d 18, 20 (3d D.C.A.Fla.1966), citing *Mendenhall v. Sweat,* 117 Fla. 659, 158 So. 280 (1934).

Under both the 1971 practice and the 1977 rule, the judge must consider all relevant factors, including the defendant's financial resources, in setting bail; he must set bail no higher than that which he deems necessary to assure the defendant's appearance at trial; and he has discretion to release a defendant on his own recognizance. The principal change effected by the 1977 rule is that non-financially conditioned forms of release implicitly available to the judge in 1971 have been specifically enumerated.

Hence, the majority is simply incorrect in concluding "[a]s an attack on the Florida procedures which existed as of the time of trial, the case has lost its character as a present, live controversy and is therefore moot". Majority opinion, at 1058. Because the current Florida bail rule ensconces the practice which the defendants, in 1971, swore they followed and which they were otherwise required to follow, the controversy in this case could hardly be more alive nor more deserving of resolution.[3]

---

**3.** The cases cited by the majority in support of its finding of mootness are inapposite. In *Kremens v. Bartley,* 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977), five named plaintiffs filed a class action challenging the constitutionality of Pennsylvania statutes governing the voluntary admission and commitment to Pennsylvania mental health institutions of persons 18 years of age or younger. During the pendency of an appeal from the district court's order declaring sections of the statutes unconstitutional, the Pennsylvania Legislature repealed most of the challenged provisions, thus mooting the claims of the named plaintiffs. While the Court found that many of the issues relevant to the class had not been mooted, it refused to reach the merits on policy, not jurisdictional grounds. Id. at 127, 97 S.Ct. at 1714. In *Diffenderfer v. Central Baptist Church of Miami, Fla., Inc.,* 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972), plaintiffs sought a declaratory judgment that a Florida statute authorizing a tax exemption for church property used for commercial purposes was unconstitutional. After a three-judge district court upheld the statute, the Florida Legislature repealed it and substituted a statute employing a "predominant use" test for the exemption. The Supreme Court remanded the case to the district court with leave to the plaintiffs to amend their pleadings. In *Hall v. Beals,* 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969), plaintiffs challenged Colorado's six month residency requirement for eligibility to vote in a presidential election. After a three-judge district court held for defendants, the Colorado Legislature reduced the residency requirement from six months to two months. The Supreme Court held that the case was moot because "under the statute as currently written, the appellants could have voted in the 1968 presidential election". Id. at 48, 90 S.Ct. at 201. In each of these cases, a finding of mootness was predicated on a direct legislative negation of the specific objection raised by the plaintiffs. In the instant case, while the Florida

## III. THE INAPPROPRIATENESS OF ABSTENTION

The en banc majority abstains from "further consideration" of the new Florida bail rule because, it concludes, "the rule is subject to constitutional interpretation and application" and "[f]urther adjudication of the merits of a constitutional challenge addressed to it should await presentation of a proper record reflecting application by the courts of the State of Florida". Majority opinion, at 1058. On this basis, it remands to the district court with directions to dismiss the plaintiffs' equal protection challenge as moot. With deference to the majority, I view abstention in this case as the equivalent of abdication.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule". *Colorado River Water Conserv. Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). The branch of the doctrine of abstention invoked by the majority, originating in *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941),[4] has been described by the Supreme Court as follows:

Where the resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication. . . . The doctrine . . . contemplates

that deference to state court adjudication only be made where the issue of state law is uncertain.

*Harman v. Forssenius,* 380 U.S. 528, 534, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965). Additionally, as the Court noted in *Harrison v. N. A. A. C. P.,* 360 U.S. 167, 176–77, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959):

[T]he federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded *a reasonable opportunity* to pass upon them. This principle does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise . . . . [citations omitted; emphasis added].

Consistent with these principles, the Second Circuit has expressed a caveat relevant to this case:

Where the state court has deliberately avoided an interpretation of a statute which might save its constitutionality or moot the federal claim, the abstaining federal court may certainly reassert the jurisdiction it was retaining in order to reach the merits. Neither comity nor sound judicial administration require the abstaining federal court to wait indefinitely for state courts to determine the merits.

*414 Theatre Corp. v. Murphy,* 499 F.2d 1155, 1157 (2d Cir. 1974).

Application of these basic principles to the facts of this case reveals that abstention is inappropriate.

---

bail rule has been amended during the pendency of this appeal, the amendment has not affected the specific objection lodged on behalf of the class. Thus, the change in the overall bail rule is irrelevant to and does not moot the specific holding of the district court.

**4.** Most textwriters, reflecting judicial decisions, recognize several distinct situations to which abstention principles may apply. For example, Professor Charles Alan Wright has identified four categories: (1) to avoid decision of a federal constitutional question where the case may be disposed of on questions of state law, as to which *Pullman,* cited in the text, is the seminal case; (2) to avoid needless conflict with the administration by a state of its own

affairs, e. g., *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); (3) to leave to the states the resolution of unsettled questions of state law, e. g., *Meredith v. City of Winter Haven,* 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943); and (4) to ease the congestion of the federal court docket, e. g., *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.,* 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200 (1952); Wright, Federal Courts, § 52 (3d Ed.1976). See also Barron & Holtzoff, Federal Practice and Procedure, § 64 (1960); 1A, Pt. 2, Moore's Federal Practice, " 0.203 (2d Ed.1977).

The instant case falls into the *Pullman* category.

1. *The Relevant Florida Law is Not Uncertain:* The threshold inquiry under the *Pullman* abstention doctrine is whether the challenged state law is uncertain, for if its meaning is unambiguous, then there is no need to await its construction by a state court. *Wisconsin v. Constantineau,* 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971); *City of Chicago v. Atchison, T. & S. F. Ry. Co.,* 357 U.S. 77, 84, 78 S.Ct. 1063, 1067, 2 L.Ed.2d 1174 (1958); Wright, Federal Courts, § 52 at 219 (3d Ed. 1976).

As relevant to the issue in this case, the Florida rule is unambiguous: it does not include a presumption against money bail in the case of indigents. The absence of such a presumption is apparent both on the face of the rule and in light of its history. Twice in the past seven years, the Florida Supreme Court has rejected a presumption against money bail. In enacting the new rule in 1977, that court borrowed, almost verbatim, from the analogous Federal Bail Reform Act of 1966, 18 U.S.C. § 3146 (1970), but deleted the language of the federal act creating a presumption against financially conditioned release. See 557 F.2d at 1200–01. Indeed, a committee note to the new rule, not adopted by the Florida Supreme Court but relevant to determining the intent of the rule's framers, admits: "The options are the same as those available under the federal rules without the presumption in favor of release on recognizance or unsecured appearance".

2. *The Courts of Florida Have Had a Reasonable Opportunity to Pass On The Question Tendered In This Case:* For *seven* years this Court stayed its hand while the Florida Supreme Court *twice* revised its bail rule. And after seven years and two revisions, there has been no change in the Florida law regarding bail which moots the challenge in this case. Considered against the history of this litigation, the majority's decision to abstain makes a mockery of the *Pullman* doctrine.

The district court ruled against the plaintiffs on their challenge to the Florida bail rule on October 12, 1971. Because the district court also ruled in favor of the plaintiffs on their claims involving Florida's preliminary hearing practices, both sides appealed to this Court. Although we heard oral arguments on both the preliminary hearing and bail issues in 1972, for the next three years we took no action on the bail issue pending resolution of the other issues in the case. Ultimately, the Supreme Court affirmed with modifications our holding on the preliminary hearing question. *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

In December, 1972, the Florida Supreme Court adopted a comprehensive revision of its Rules of Criminal Procedure, effective February 1, 1973. *In re Florida Rules of Criminal Procedure,* 272 So.2d 65 (Fla.1972). At that time the Florida Supreme Court expressly rejected a proposal by a special advisory committee to incorporate a presumption against money bail. Justice Ervin dissented because he felt that the rule adopted by the court would discriminate against the poor:

> I am unable to support Rule 3.130 which will continue the current discriminatory bail bond system. I am deeply distressed by this Court's rejection of the "pretrial release" rule unanimously recommended by our Special Advisory Committee.
>
> In its "Note" following the proposed pretrial release rule, the Committee said: "This rule replaces Rule 1.130, Florida Rules of Criminal Procedure, entitled 'Bail.' The existing rule placed almost complete emphasis on money bail rather than less onerous conditions of release. The proposed rule presumes that if the defendant is likely to appear, there is no need for an arrest, or, if an arrest has occurred, the defendant should be released on his own recognizance or promise to appear."
>
> The Rule adopted by this Court will perpetuate that money-bail emphasis; I am unwilling to further support Florida's archaic bail bond system.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The Advisory Committee's rule attempted to eliminate these unjust results

of the bail bond system by guaranteeing that all persons, regardless of financial status, would not needlessly be detained pending their appearance when detention would serve neither the ends of justice nor the public interest. It created a presumption that an accused is to be released without bail unless it is shown that there is reason to believe that his release should be conditioned in some fashion.

If conditions of release were found to be necessary, the Committee's rule provided that "the judicial officer shall impose the least onerous condition reasonably likely to assure the defendant's appearance in court." Money bail was a last resort, and even fully secured bail was to be required only in extreme cases where no other condition would satisfactorily guarantee the defendant's appearance. In each instance where a judicial officer or his authorized deputy, or law officer acting under his authority determined a summons, the defendant's promise to appear, or personal recognizance to be insufficient to assure the defendant's presence, the proposed rule required that the judicial officer give reasons for the imposition of conditions.

* * * * * *

The Committee's rule was an excellent attempt at eliminating from our legal system one more means of discriminating against the poor. It should have been approved.

272 So.2d at 69, 71, 72 (Ervin, J., dissenting).

Clearly, then, the Florida Supreme Court in 1972 had an opportunity to promulgate a bail rule which would have mooted the plaintiffs' claim in this case. It nevertheless opted for a rule which left the federal claim unaffected.

After the United States Supreme Court decided *Gerstein v. Pugh, supra,* the other aspect of this case, we heard additional oral argument on the bail question on November 11, 1975. In his argument for the defend-

ants, Paul Zacks, an Assistant Attorney General of Florida, suggested that the 1972 bail rule could be construed to include the presumption advocated by the plaintiffs and that plaintiffs' counsel, Phillip Hubbard, should seek such an interpretation from the Florida Supreme Court. The panel, made up of Judges Gewin, Bell,[5] and Simpson, approved this suggestion and strongly urged the parties to cooperate in presenting this question to the Florida Supreme Court. The following excerpts from the oral argument illustrate the panel's determination to give the Florida courts an opportunity to resolve the question presented for federal review:

JUDGE SIMPSON: If [the rule] isn't precise enough or broad enough, the remedy may be to go before [the Florida Supreme Court] to have this state commission or committee—bar committee, or someone—go before them and ask for amendment of the rule rather than have a court case about it.

MR. ZACKS: Very true.

JUDGE SIMPSON: I don't know. I think you ought to cover all the possible alternatives when you brief this matter. What we're talking about is this Court holding in abeyance while some relief is sought from the Supreme Court of Florida. I don't know how much we should tell you about what to ask them or how to go about doing it, but all the possible— all the alternatives should be explored in your brief.

JUDGE BELL: 1971, I suppose—somewhere along in there—I granted a stay, and I did it because I thought there was something wrong with the system where we were getting ready to displace the Supreme Court of Florida's rule-making power. Now the case has been going on all this time, nobody's doing anything and we're faced up with it again. It seems to me the Attorney General of Florida would want to get into the act and preserve state's rights, state responsibilities

---

**5.** Although a member of the original panel at the time of oral argument, Judge Bell resigned from the Court prior to decision of this case by the panel on August 22, 1977. The case was decided by a quorum, as authorized by 28 U.S.C. § 46(d).

and preserve the Florida court system's rule-making power. If we make these rules, we'll make other rules.

\* \* \* \* \* \*

JUDGE BELL: I think Judge Simpson is right. We don't want to tell you what to do. We don't want to write the rules. We'd rather you go and get the thing straightened out. The Attorney General of Florida represents all the people and the courts.

\* \* \* \* \* \*

JUDGE GEWIN: We tried to get you to be—embrace the idea of brotherly love in this field of litigation and try to work it out . . .. And leave the federal courts alone so people won't say, "You're taking over our state business".

MR. ZACKS: Well, we didn't bring this in the federal courts and I would also like to point out—

JUDGE BELL: But you're not doing—well, you've had five years and you haven't done anything to get it out of the federal courts. I was your friend. I stayed the case. But I'm losing my patience pretty fast. Five years is a pretty long time to wait around.

JUDGE SIMPSON: . . . This is a broad policy matter, and it would seem to me that you should interview [Attorney] General Shevin about it and about the stand he wants to take and get, maybe get authority to go further than you are prepared to say you want to go today because it's—this is the way to do it. Have Florida take care of its own business rather than put it over on the federal courts.

\* \* \* \* \* \*

JUDGE BELL: We're talking about a policy matter that's very important.

JUDGE GEWIN: . . . You get to [Mr. Shevin]. Tell him the federal judges thought that he was a good man to help solve this problem. And if he says, "Well, you get out of the door", then we'll decide it. We can decide it, but we'd just rather that the state would do it.

On several occasions after the 1975 oral argument, plaintiffs' attorneys and attorneys for the Dade County Bar Association, as amicus curiae, presented their case to the Florida Supreme Court and to appropriate committees of the integrated Florida Bar. The Attorney General of Florida refused to participate in these efforts, taking the position that the 1972 revision of the Florida Rules of Criminal Procedure divested this Court of jurisdiction in this case. In February, 1977, the Florida Supreme Court promulgated a new rule concerning bail, *The Florida Bar re Florida Rules of Criminal Procedure*, 343 So.2d 1247 (Fla.1977) (Fla.R. Crim.P. 3.130), but declined to adopt the specific revisions requested by the plaintiffs. Counsel for plaintiffs petitioned for rehearing, in part, on the ground that "[m]oney bail should be used, especially with regard to indigents, only when it is found that no other condition will reasonably assure the defendant's appearance in court". The Florida Supreme Court, with two Justices dissenting, denied the petition for rehearing. 343 So.2d at 1266.

To abstain now, under these circumstances, is absurd. This simply is not a case like *Pullman* where "a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication". 312 U.S. at 500, 61 S.Ct. at 645. The State of Florida has had more than the reasonable opportunity demanded by the abstention doctrine and has three times unambiguously refused to rule in a manner capable of mooting this case. For seven years we *have* abstained. The time has come for this federal court to reach the merits of the plaintiffs' federal constitutional claim.

Ironically, while the en banc majority purports to exercise "a wise discretion" in restraining its authority "because of 'scrupulous regard for the rightful independence of the state governments'", *Pullman, supra*, 312 U.S. at 501, 61 S.Ct. at 645, it nevertheless instructs the Florida Supreme Court on the correct interpretation of the 1977 bail rule. "We have no doubt", writes the majority, "that in the case of an indigent,

whose appearance at trial could reasonably be assured by one of the alternate forms of release, pretrial confinement for inability to post money bail would constitute imposition of an excessive restraint". Majority opinion, at 1058. Similarly, in footnote 8 of its opinion, the majority endorses a "Committee Note" not adopted by the Florida Supreme Court, explaining that the committee's interpretation of the new rule as requiring "the least onerous form of release" "is enhanced . . . by the absence of a constitutional alternative".

While these comments derogate the majority's professed concern for the lofty principles of federalism, they reveal that the en banc court and the panel are not separated by a wide gulf with respect to the substantive principles supporting the plaintiffs' contention in this case. The true point of departure, as I see it, concerns the minimum standard required to guarantee the equal protection rights of indigents in the context of pretrial release. The panel opinion focused narrowly on that right and concluded that, at the very least, a presumption against money bail for indigents was necessary. The en banc majority contents itself with the assumption that the rights of indigents—and of all persons—will be protected by the rule against excessive bail. I reject this position for two reasons.

First, despite the en banc majority's attempt to disavow the panel's holding, its arguments are directed toward a legal position never presented to or advanced by the panel. The majority posits that "[t]he argument favoring a specified priority sequence for the various forms of release overlooks the fact that its impact may vary under varying circumstances". Majority opinion, at 1057. Ultimately, it concludes: "A mechanical consideration of priorities among various other modes of release may conform to constitutional requirements. We perceive no reason, however, why less explicit requirements may not be applied in an altogether constitutional manner". Majority opinion, at 1057–1058. This reasoning is specious because this case does not involve "a specified priority sequence" or "a mechanical consideration of priorities" among

varieties of pretrial release. Rather, it requires consideration of the need for a rebuttable presumption against one form of pretrial release—money bail—as applied to one class of persons—indigent pretrial detainees. Under established equal protection principles, as expounded at length in the panel opinion, there is manifestly a constitutional necessity for such a presumption in the case of those who, by definition, have no money. The panel never addressed the priority sequence of alternative forms of release and, indeed, did not hold that, under the presumption, money bail may *never* be imposed on an indigent.

Secondly, the *ratio decidendi* of the panel's holding was that the presumption against money bail guarantees a proper regard for equal protection strictures in the decision concerning pretrial release of indigents. Here again, the majority ignores the legal issue before it and erects a straw man easily demolished. In noting that the Supreme Court of Florida has twice declined to incorporate a presumption against money bail into the Rules of Criminal Procedure, the majority states, "It is argued that we therefore should conclude that a contrary result was intended, that the automatic setting of money bails will continue and that the unnecessary and therefore constitutionally interdicted pretrial detention of indigents will be the inevitable result". Majority opinion, at 1058. Of course, no such argument has been made in this case. The point is not that the new rule "requires" or makes "inevitable" the automatic setting of money bail, but rather that it is wholly lacking in safeguards to insure that indigents are not discriminated against, even inadvertently, in the decision-making process.

The majority deludes itself in concluding that the new bail rule furnishes adequate safeguards by limiting bail to that which is "necessary" to assure a defendant's appearance. At least since 1934, when the Florida Supreme Court decided *Mendenhall v. Sweat*, 117 Fla. 659, 158 So. 280 (1934), the

rule in Florida has been that bail may not be fixed in so excessive an amount as to preclude the probability of the accused's being able to furnish it.[6] .Yet, in this case, the Director of the Corrections and Rehabilitation Department of Dade County, Florida, testified that on June 3, 1971, approximately 500 pretrial detainees were housed in the Dade County Jail and the Dade County Stockade, and that the majority of those were imprisoned because they could not afford bail. R. 308–10. Similarly, in January, 1976, a United States District Court judge in Miami found that 28 percent of the pretrial detainees at the Dade County Jail were there solely because they could not afford bail. *Bridges v. Sandstrom*, No. 74–994–Civ–JE (S.D.Fla. Jan. 14, 1976). In effect, then, the "necessity" requirement has provided only illusory protection for the equal protection rights of indigents. Necessity is an indefinite entity, to be determined in the exercise of a judge's discretion on an *ad hoc*, case by case basis. See, e. g., *State ex rel. Bardina v. Sandstrom*, 321 So.2d 630 (3d D.C.A. Fla.1975). Once exercised, a judge's discretion is reviewable only for abuse, the incarcerated defendant bearing

the burden of proof. See *Lambert v. State*, 151 So.2d 675 (1st D.C.A. Fla.1963).[7] I cannot escape the conclusion that the majority has chosen too frail a vessel for such a ponderous cargo of human rights.

Judge Weinstein of the Eastern District of New York stated the issue well:

In this country we do not pay lip service to the value of human rights· and individual dignity—we mean to live by our ideals. A primary role of the courts is to translate these noble sentiments into palpable reality.

*Birnbaum v. United States*, 436 F.Supp. 967, 970 (E.D.N.Y.1977).[8]

Fifteen years ago, then Supreme Court Justice Arthur Goldberg complained that "the courts and other organs of government, both state and federal, have not brought their ingenuity sufficiently to bear on [many] crucial areas of equal justice", including the problem of bail for indigents. "Think of the needless waste", he wrote, "—to the individual, the family, and the community—every time a responsible person presumed by a law to be innocent is kept in jail awaiting trial solely because he

---

**6.** In his special concurrence, Judge Clark states: "When a court requires monetary bail it is not primarily concerned with the financial status of the person in custody. Instead, its main concern is to ensure the accused's appearance at trial. . . . Since an indigent can never post monetary bail in any amount, due process or equal protection considerations based on the ability of the indigent to fund the bail, would destroy the entire concept of monetary bail. Excessiveness, the only constitutionally articulated guide should be the measure used". In Florida, however, under *Mendenhall v. Sweat, supra*, excessiveness is directly related to an accused's ability to pay. Cf. *State ex rel. Bardina v. Sandstrom*, 321 So.2d 630 (3d D.C.A. Fla.1975); *Matera v. Buchanan*, 192 So.2d 18 (3d D.C.A. Fla.1966). These precedents notwithstanding, money bail in Florida has not been destroyed.

**7.** One commentator, apparently sympathetic to the majority's view that the "necessity" requirement affords protection comparable to a presumption against money bail, nevertheless criticized the new bail rule for failing to provide a meaningful standard of review:

[T]he Florida rule does not incorporate a mandate of the [Federal] Bail Reform Act

that the judge release the accused on recognizance or on an unsecured appearance bond unless he determines such to be inadequate, and then to impose only the least restrictive further conditions necessary to guarantee appearance. This omitted provision seems self-evident and innocuous enough, since to impose restrictions beyond those necessary to guarantee appearance would certainly be an unconstitutionally excessive bail. Nevertheless, the omitted provision, when read with another omitted provision of the federal act requiring the judge to state in writing his reasons for imposing a condition or conditions of release where the accused is unable to meet them [18 U.S.C. § 3146(d) (1970)], provided a standard (however broad) of judicial review, which the committee or the supreme court perhaps desired to avoid.

Yetter, *The Florida Rules of Criminal Procedure: 1977 Amendments*, 5 Fla.St.U.L.Rev. 241, 246–47 (1977) (footnotes omitted).

**8.** See also the excellent article by Judge Johnson of the Middle District of Alabama, *The Role of the Judiciary With Respect to the Other Branches of Government*, 11 Ga.L.Rev. 455 (1977).

is unable to raise bail money".[9] And yet only last year, a distinguished criminal law scholar, Caleb Foote, lamented the "incredible failure of the Supreme Court, courts in general and lawyers, to do anything about what has become the most pervasive denial of equal justice in the entire criminal justice system", the setting of money bail for indigent defendants.[10]

The panel, having before it the proper parties and a genuine controversy ripe for adjudication, attempted to conform monetary bail practices in Florida to "the moral imperative implicit in the noble concept of equal justice before the law".[11] The en banc majority, wrongly and regrettably, has chosen to decline the invitation.

I respectfully dissent.

CHARLES CLARK, Circuit Judge, with whom TJOFLAT, Circuit Judge, joins, specially concurring:

I concur with the en banc majority that this case is moot insofar as it involves any controversies which this class raised concerning the former Florida bail rules. Those controversies have been superseded by the new rules. I further agree that the case is not moot insofar as it concerns a constitutional challenge to the facial validity of the new rules, and I agree with what I understand to be the majority's conclusion: that those new rules are constitutional on their face. I respectfully disagree, however, with the majority's reasons for concluding that the new rules are facially valid.

The en banc majority's opinion states that it disavows the panel's view that the Constitution mandates a hierarchy of devices to ensure appearance at trial, but then utilizes the same approach in analyzing the constitutionality of state bail statutes as was taken by the panel's opinion. I voted for en banc reconsideration because I

thought that the panel opinion approach had the inevitable effect of rendering monetary bail unconstitutional, and because I considered that analysis misfocused and wrong. I cannot read the Constitution to either prohibit monetary bail or require a hierarchy of assurances of appearance. The Constitution's only explicit limitation on the imposition of bail is the eighth amendment's command that it may not be excessive. This constitutional imperative does not prevent a state from continuing to maintain a system for pretrial release of all persons based on monetary bail alone. That a state may also permit persons incarcerated pending trial to obtain their freedom through other means should not create a constitutional requirement that a priority order be developed among the means permitted.

In the view of the en banc majority, the Florida bail rules are constitutional because they require the "meaningful consideration of other possible alternatives." The majority writes that the "incarceration of those who cannot [meet the requirements of a master bond schedule], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements." "The ultimate inquiry," in the words of the majority, "in each instance is what is necessary to reasonably assure defendant's presence at trial." The majority's opinion explicitly states that that inquiry would be eased by hierarchies of release devices or by mechanical consideration of alternatives in an established order of preference. Implicit in those statements is a constitutional disapproval of monetary bail for indigents. Indeed, the majority's opinion states that it would be an excessive restraint for the state to imprison an indigent if his appearance at trial could be reasonably assured by other means. Such a belief, however attenuated in ex-

---

**9.** Goldberg, *Equality and Governmental Action*, 39 N.Y.U.L.Rev. 205, 221, 222 (1964).

**10.** Professor Foote's comments were made in an article by him entitled *Pre-Trial Detention: Bail or Jail?*, which appeared as Part XI of a syndicated series, "Crime and Justice in Ameri-

ca". The Gainesville Sun, Nov. 21, 1977, at 8E. He is better known for his article *The Coming Constitutional Crisis in Bail*, 113 U.Pa.L.Rev. 1125 (1965).

**11.** Goldberg, *supra* note 8, at 218.

pression, necessarily leads to the conclusion that monetary bail for indigents is unconstitutional.

When a court requires monetary bail it is not primarily concerned with the financial status of the person in custody. Instead, its main concern is to ensure the accused's appearance at trial. The theory of monetary bail is that it will impel the accused to return for trial by making failure to appear cause the automatic forfeiture of property. A person who posts bail from personal resources faces the loss of his own property if he does not appear. An indigent, by definition, has no personal resources. Imposing monetary bail on an indigent necessarily contemplates that he has friends or relatives willing to offer their property as an assurance that he will appear. It not only commands their sincere belief that the defendant will appear at trial as directed, but also commits them to a personal propriety interest in such behavior. Therefore, it is illogical to gauge the constitutionality of monetary bail by notions of due process or equal protection based on the defendant's indigency. Since an indigent can never post monetary bail in any amount, due process or equal protection considerations based on the ability of the indigent to fund the bail, would destroy the entire concept of monetary bail. Excessiveness, the only constitutionally articulated guide, should be the measure used. If it is, state systems structured on monetary bail can continue. The amount of such bail can be tailored to the trustworthiness of the defendant, his ties to the community, the seriousness of the offense, and other factors which have a direct bearing on assuring his appearance for trial.

Speaking in a monetary bail case, the Supreme Court said, "Bail, of course, is basic to our system of law." *Schilb v. Kuebel,* 404 U.S. 357, 365, 92 S.Ct. 479, 484, 30 L.Ed.2d 502 (1971). The Court has never suggested that monetary bail is in any way constitutionally suspect. I am not unaware that challenges to the use of monetary bail have been made. But in the absence of even the slightest contrary intimation from the Supreme Court, I am unwilling to be the judge who holds those challenges find support in the Constitution.

COLEMAN, Circuit Judge, specially concurring.

I have concurred in the majority opinion because (1) it repudiates the notion that as to indigents the Constitution requires a presumption against the imposition of monetary bail and (2) because it concludes that the new Florida Rules are facially constitutional.

I am impressed however, with Judge Clark's comments, which prompts some observations of my own.

I continue to believe that criminal laws apply alike to all individuals, regardless of wealth or the lack of it. Most citizens who are less well off than others conscientiously obey the law as a matter of course. A great disservice is done poorer people by inferring that the dollar sign relegates them to a special kind of second class citizenship which renders them incapable or unwilling to obey the rules of normal conduct. They are encouraged to wallow in that supposedly inferior status before the law by being singled out for special treatment when it comes to responsibility for compliance with the law. Some of the most highly respected citizens are those who do not have money but who have great personal worth.

If they desire it, indigents are entitled to counsel at public expense. They now receive it as a matter of mere routine. This guarantee of counsel addresses the very problem we now have under consideration. No person may be arrested or jailed except upon *probable cause.* If there is no probable cause, the Great Writ provides an immediate remedy. Counsel has only to invoke it. Those who arrest or imprison without probable cause are liable to civil penalties or criminal punishment, or both.

Of course, people may not be denied reasonable bail in bailable cases, but they are not entitled to bail on their own terms. The constitutional limitation is that excessive bail shall not be required.

Our jurisdiction over state administration of local criminal law and procedure is limited to enforcing the commands of the Constitution of the United States. We have no authority to advance beyond that limit.

If the committing officer or magistrate mistakenly prescribes excessive bail an immediate remedy is available. If reasonable bail is set and the defendant cannot make it the Constitution does not command that he shall be released. If these principles are not to be applied to all citizens alike then every defendant should be released on his own recognizance—an untenable approach, as sad experience has often, with little success, tried to teach us.

GEE, Circuit Judge (specially concurring):

With deference, it seems to me that in debating the issue whether some presumably innocent persons awaiting trial may, consonant with equal protection, be released on grounds not available to others—including a ground arguably involving classification by wealth—both the majority and the dissent take hold of the wrong end of the stick.

Florida maintains a system by which pretrial detainees may obtain release in various ways, the fifth of which is putting up money bail. The dissent maintains that since paupers cannot put up this bail, the scheme discriminates against them on grounds of wealth, an arguably suspect classification, in failing to incorporate a presumption against such bail for them. If this be so, and the equal protection attack by these indigent detainees had carried, I do not see how they would have benefitted from their victory. We cannot write such a presumption as the indigents contend for into the Florida rule. All we could do is strike down its provision for money bail entirely, as invalid for want of such a presumption. The only result of such an action as that by us would be that others who might by this traditionally-recognized means have been enabled to secure their appearances and so have obtained release must remain incarcerated—barred from the manger by Aesop's proverbial dog. I suggest that these people are the ones properly to be identified with Martial's goats (dissent, n. 2), which the dissent complains nobody discusses, and I propose to discuss them.

It seems to me that the appropriate analysis, whether along equal protection lines or those of due process, should not focus on one factor of the Florida grocery list to the exclusion of all others. No one maintains that we are not in the presence of a compelling state interest, that of assuring that persons accused of crimes will appear for trial. Present also is a right, the right of one charged but not proven guilty to go free if his presence at trial can reasonably be secured. The list of means for obtaining release provided by Florida for such persons should therefore be as inclusive as possible, permitting anyone able reasonably to assure his appearance at trial by any means available to *him* to do so. The fact that one among many of the means specified is unavailable to other detainees does not mean that *he* should not be released if it is available to *him*. For the focus must be on the right to release—to bail—of those still presumed innocent, and on effectuating that right by all reasonable available means, rather than on limiting the exercise of that right as narrowly as possible—to means universally available to *all* detainees. To do so is to stand the right to release on its head.

But, it may be objected, suppose Florida should add to its six criteria a seventh providing for release, say, of accused females over age forty? How could such a provision, keyed to sex and age, pass constitutional muster? My answer is that if experience reliably indicated that females over forty invariably (or almost so) appeared for trial although released without other security, it might well be unreasonable on the part of Florida authorities to place additional conditions on their release. The emphasis, in other words, should be on the breadth and rationality of the span of classifications, not on how universally each mode of release specified is available to detainees. But if I understand the dissent's analysis

under it such a criterion would be stricken down out of hand as violative of equal protection.

Here we deal with a right, the right to release of presumably innocent citizens. I cannot conceive that such release should not be made as widely available as it reasonably and rationally can be. It is beside the point that a rational ground for release may happen to coincide with an otherwise suspect category. Perhaps this circumstance may trigger strict scrutiny of its rationality, but the aim of that scrutiny should be to determine whether the category is not reasonably calculated to effectuate its purpose—release of those who by means of it may assure their appearance at trial—or whether it is too *narrowly* drawn, not to eliminate it because others may not be able to avail themselves of it and so swell the jail populations with persons who need not be there.

I agree with the majority that the new bail rule is the only issue presently before the court and that the rule is not facially unconstitutional. To me, it pretty clearly requires release of a pretrial detainee if he can satisfy *any* of its categories for securing his appearance, one of which is open-ended. (Majority opinion, n. 2). Since this is so: since all means permitted by the rule must be considered by the magistrate before he decides whether release can be risked or not, I do not see that it matters which he considers first, third or last. The dissent's discussion of a presumption against money bail for paupers, which seems to me to say no more than that the magistrate must consider this means last of all when paupers are before him, is therefore too refined for me to grasp.

ALVIN B. RUBIN, Circuit Judge, concurring.

The rhetoric of the dissent is eloquent. But dilemmas, like goats, have two horns. The new bail rule is not unconstitutional on its face and the dissent does not even suggest that proposition. It cannot be held unconstitutional as applied because there is no evidence yet concerning how the courts of Florida will execute it. The dis-

senters assume that "the 1971 practice" will prevail following adoption of the 1977 rule. This is not only unwarranted logically, but without cited precedent as a basis for declaring state action unconstitutional. See *Fusari v. Steinberg,* 1975, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521.