**Dale Paul CRUIKSHANK, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 76–0362.**

United States District Court, D. Hawaii.

March 26, 1979.

On Motion to Reconsider May 7, 1979.

David L. Turk, Turk & Kuniyuki, Honolulu, Hawaii, American Civil Liberties Union of Hawaii Foundation, Honolulu, Hawaii, for plaintiff.

Walter M. Heen, U. S. Atty., Honolulu, Hawaii, Alphonse M. Alfano, David J. Anderson, Attys., Barbara Allen Babcock, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for defendant.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

SAMUEL P. KING, Chief Judge.

### SUMMARY OF CASE

I previously denied the government's motion to dismiss. *Cruikshank v. United States,* 431 F.Supp. 1355 (D.Hawaii 1977). The case proceeded to trial on August 29, 1978. Following trial, both sides submitted post-trial memoranda. The government essentially reargued the motion to dismiss. Plaintiff pointed out that under New York law he was entitled to substantial damages for an invasion of his common law right of privacy. He also claimed damages for violation of his constitutional rights. In addition to other claims, he claims mental and emotional distress.

■ In accordance with the principles enunciated in my own earlier decision in *Cruikshank v. United States,* 431 F.Supp. 1355 (D.Hawaii 1977), and the essentially contemporaneous case of *Birnbaum v. United States,* 436 F.Supp. 967 (E.D.N.Y.1977) decided by Judge Weinstein, I find that the defendant is liable to the plaintiff and award damages to the plaintiff in the amount of $1,000.

### FINDINGS OF FACT

The stipulated facts are as follows:

1. From 1953 through 1973, the Central Intelligence Agency operated a mail opening project, code named alternatively HTLINGUAL or SRPointer, which was designed to intercept for foreign intelligence, and foreign counter-intelligence purposes, certain mail, including sealed first class mail, passing between the United States and the Soviet Union through the United States Post Office in New York.

2. Of the mail selected for interception, a substantial portion was opened in accordance with a watch list prepared by the CIA, which contained names of persons, locations, and institutions which were of particular intelligence interest to the CIA, and some was opened at random.

3. Certain of the intercepted mail was opened, copied, re-sealed and returned to the mail within no more than 24 hours.

4. The mail was intercepted and opened without a judicial warrant.

5. The mail selected for opening was put aside and the remaining mail was put back in the mail bags and returned to the mail rooms for postal processing that same day.

6. The copies of the opened mail were sent from New York to the CIA Headquarters in Langley, Virginia. Some of the copies were translated and/or summarized by one of four trained letter analysts on the counter-intelligence staff.

7. The letter analysts, depending upon the contents and the various interests and requirements of the CIA or other federal intelligence agencies, sent some or all of the reports to the FBI, the Security Research Staff, and the Office of Security of the CIA and some other operating components within the CIA.

8. Special and specific clearance had to be individually granted for anyone to have knowledge of and access to knowledge about the mail opening program or knowledge about the contents of the intercepted letters.

9. Generally, between 50 and 75 pieces of mail were opened and copied each day.

10. The mail opening program was terminated in February, 1973.

11. Nineteen sealed envelopes containing mail sent by or to plaintiff Cruikshank to correspondents in the Soviet Union were opened by CIA agents in New York during the course of the mail opening program.

12. In addition to the nineteen sealed envelopes referred to in paragraph 11 above, two postcards sent by plaintiff Cruikshank to correspondents in the Soviet Union were intercepted by the CIA in New York during the course of the mail opening program.

13. A list of the envelopes and postcards referred to in paragraphs 11 and 12 above are set forth in Appendix A attached hereto. This list indicates the date of each item

of mail intercepted, the addressor and addressee.

14. Plaintiff Cruikshank was not on any watch list at the time that any of his mail was intercepted nor at any time thereafter.

15. Plaintiff Cruikshank, by letter dated July 25, 1975, specifically requested an accounting of mail intercept items pertaining to him and his contacts in the U.S.S.R. This letter cited the Freedom of Information Act (FOIA) as the basis for the request. By letter dated December 18, 1975, the CIA responded to the plaintiff's request furnishing him copies of items 3 through 21 in the attached list, (See Appendix A), which had been located at that time through a search of CIA records. Subsequently, at the time that the CIA was notified of this litigation, a supplementary search identifed two additional items (numbers 1 and 2 on Appendix A). It was determined, as a result of this supplementary search, that item number 6 on Appendix A, originally described to plaintiff Cruikshank as unopened, had in fact been opened. All of this newly discovered information and copies of items 1 and 2 were furnished to plaintiff Cruikshank by letter from the CIA dated June 24, 1977.

16. Apart from copies made to respond to the plaintiff's FOIA request, and in preparation for this litigation, one copy of each of the items of plaintiff's mail appearing on the list attached as Appendix A continues to be maintained in mail opening project files to which access is limited to those responding to FOIA requests, claims filed with the CIA under the Federal Tort Claims Act, and litigation such as this case.

17. One copy of twelve of the items appearing on the list attached as Appendix A was disseminated to specific individuals within the CIA who had been specially cleared in order to obtain access to information from the mail opening program. Although no record exists detailing what happened to these copies, the policy was to return all copies of mail opening material disseminated within the CIA to the counterintelligence staff where they were destroyed.

18. A total of twelve items of the plaintiff's mail appearing on the list attached as Appendix A were provided to the Federal Bureau of Investigation. No other distribution of these items was made outside of the CIA.

19. One copy of each item of plaintiff's mail provided to the FBI is presently maintained in a file apart from general FBI Headquarters files. Access to the file is restricted to persons responding to FOIA requests, defending lawsuits such as this one, and checking employment applications.

20. On or about March 1, 1976, plaintiff Cruikshank filed administrative claims under the Federal Tort Claims Act seeking damages which allegedly resulted from the interception and opening of his mail. Claims were filed with the CIA, FBI, Postal Service and the Department of Justice. All claims were denied either expressly or by operation of law within the meaning of 28 U.S.C. § 2675.

The envelopes and postcards listed on Appendix A referred to in paragraph numbered 13 above are as follows:

## Appendix A

1. Envelope and greeting card, 8 May 1969, CRUIKSHANK, Moscow, to Dr. D. P. CRUIKSHANK, Arizona—also enclosed blank sheet of paper (not copied).

2. Envelope, technical article, 6 December 1965, CRUIKSHANK, Arizona, to Dr. V. I. MOROZ, Moscow.

3. Envelope and letter, 23 November 1968, CRUIKSHANK, Moscow, to Mr. and Mrs. Tom FALK, Afghanistan (readdressed to California).

4. Envelope and letter, 22 February 1969, CRUIKSHANK, Moscow, to Prof. A. H. DELSEMME, Ohio.

5. Envelope and letter, 22 February 1969, CRUIKSHANK, Moscow, to Dr. R. RAWSON, Arizona, enclosed check and membership card.

6. Envelope, 5 March 1969, CRUIKSHANK, Moscow, to Dr. D. P. CRUIKSHANK, Arizona, enclosed blank sheet of paper (not copied).

7. Envelope and letter, 5 March 1969, CRUIKSHANK, Moscow, to Allen B. THOMSON, Arizona.

8. Envelope and letter, 27 April 1969, CRUIKSHANK, Moscow, to Prof. S. R. TITLEY, Arizona.

9. Envelope, 8 May 1969, CRUIKSHANK, Moscow to Dr. D. P. CRUIKSHANK, Arizona—enclosed blank post card (not copied).

10. Envelope, letter, article and graph, 22 August 1969, CRUIKSHANK, Arizona, to Prof. V. I. MOROZ, Moscow.

11. Envelope and letter, 18 August 1969, Prof. V. I. MOROZ, Moscow, to CRUIKSHANK, Arizona.

12. Envelope and letter, 19 September 1969, CRUIKSHANK, Arizona, to Prof. V. I. MOROZ, Moscow.

13. Envelope and letter, 10 October 1969, CRUIKSHANK, Arizona, to Dr. Felix SYTSIN, Moscow.

14. Envelope and letter, 10 October 1969, CRUIKSHANK, Arizona, to L. SVETLOVA, Moscow—also enclosed blank card.

15. Envelope and letter, 10 October 1969, Alisa GOTOCHAVA, Ukrainian SSR, to CRUIKSHANK, Arizona.

16. Post card (front and back), 8 November 1969, CRUIKSHANK, Arizona, to Yu. N. LIPSKII, Moscow.

17. Envelope and letter, 28 March 1970, B. VORONTSOV—VELYAMINOV, Moscow, to CRUIKSHANK, Arizona.

18. Post card (front and back), 5 April 1970, CRUIKSHANK, Arizona, to Prof. B. A. VORONTSOV—VELYAMINOV, Moscow.

19. Envelope and letter, 28 April 1970, CRUIKSHANK, Arizona, to Prof. B. VORONTSOV—VELYAMINOV, Moscow.

20. Envelope, letter and graph, 19 July 1970, V. I. MOROZ, Moscow, to CRUIKSHANK, Hawaii.

21. Envelope and letter, 14 May 1971, CRUIKSHANK, Hawaii, to Prof. B. A. VORONTSOV—VELYAMINOV, Moscow.

Further findings of fact are as follows:

Plaintiff is an associate astronomer at the University of Hawaii engaged in pure research; he has no formal teaching assignment. He was born in Des Moines, Iowa, on August 10, 1939. He received his bachelor's degree in physics at Ames, Iowa, in 1961, and his master's degree in 1965 and doctorate in 1968 at Tucson, Arizona. From September 1968 to July 1969 he was in the Soviet Union in connection with his specialty. He returned to Tucson and then came to Hawaii in 1970. In 1973 he spent five months in the Soviet Union, in 1976–77 two weeks, in 1978 two months. He studied Russian at the University of Iowa. He speaks Russian.

In 1975 he heard of the CIA's mail opening program. In July 1975 he wrote to the CIA asking for disclosure as set out in paragraph numbered 15 above. His reactions at first receiving the packet of his mail from the CIA included anger, shock, dismay, outrage, feelings of exposure and invasion of privacy, concern about other surveillance activities that might have been or were currently being carried out, disillusionment, concern for persons with whom he corresponded, some paranoia about traveling. He checked his telephone and office for bugs, locked his files, reviewed his correspondence. He stopped corresponding with some of those earlier correspondents who were in the Soviet Union for fear of getting them into trouble. He omitted all but necessary language in his correspondence. The first several weeks after the revelation that his mail had been opened and copied by the CIA were the worst. He filed suit on September 28, 1976.

He admitted on cross-examination that he had always allowed for the possibility that Soviet authorities might be opening his mail, and that he did not require any medical attention or medication (other than aspirin) as a result of mental or emotional distress. He has applied unsuccessfully to NASA for employment on three occasions. He does not know why he was not hired and cannot relate it to the CIA program.

Under the circumstances I am of the opinion that plaintiff is entitled to some

damages, but how much becomes a more difficult problem. Judge . Weinstein in *Birnbaum* awarded each plaintiff damages in the amount of $1,000 and costs. His discussion of the measure of damages in 436 F.Supp. at 986–89 is illuminating and is adopted by me here. It is to be noted that he used an advisory jury of 12 members who recommended much larger amounts (3 for $10,000, 8 for $5,000, 1 for $2,500). It is also to be noted that he conditioned his lesser amount on the government providing "a suitable letter of regret and assurance of non-recurrence." He also awarded plaintiff's attorney 25% of the $1,000, that being the statutory maximum permitted by 28 U.S.C. § 2678.

I do not mean to denigrate plaintiff in any way for bringing this action nor to detract in any way from the injuries he has suffered. As stated by Judge Weinstein, the injuries one suffers from the conduct complained about are substantial; it is also entirely reasonable and normal for any citizen whose privacy has been invaded by the government to experience emotional distress. On the other hand, plaintiff has suffered "none of the tangible indicia of harm for which a dollar value may easily be assigned." 436 F.Supp. at 987. He has not shown any financial loss. His job, reputation and prestige in the community has not suffered. His home was not broken into. He was not assaulted or detained. He lost no time from work and incurred no medical expenses.

Also as pointed out by Judge Weinstein, "[a]wards of the magnitude suggested by the advisory verdict have been found only where plaintiffs have suffered objective, observable injuries as a result of interferences with their civil liberties." *Id.* at 989. This includes such cases as *Zarcone v. Perry*, 75–C–1619 (E.D.N.Y. July 20, 1977), aff'd, 572 F.2d 52 (2d Cir. 1978), where $141,000 was awarded for false arrest and imprisonment with handcuffing, public humiliation, substantial medical expenses and economic loss, and substantial punitive damages.

Finally, Judge Weinstein compared the situation in *Birnbaum* with the illegal interception of telephone or oral conversations. In the latter situation under the Omnibus Crime Control and Safe Streets Act of 1968, P.L. 90–351, Congress created a right to civil recovery of $100 a day or $1,000, whichever was larger, although special damages, punitive damages, and attorney's fees are also recoverable. 18 U.S.C. § 2520.

## CONCLUSIONS OF LAW

Plaintiff's complaint states a cause of action under the Federal Tort Claims Act for invasion of privacy and for illegal warrantless search.

Both federal and New York law apply in determining liability and measure of damages.

Plaintiff has proved the material allegations of his complaint and is entitled to damages.

Under all the circumstances, an award of $1,000 in general damages is reasonable, provided the government furnishes to plaintiff a suitable letter of regret and assurance of non-recurrence.

Plaintiff's attorney is entitled to a fee of $250, payable out of the award to plaintiff.

Plaintiff is entitled to his costs herein.

Counsel for the parties shall attempt to agree upon a form of judgment for presentation to the court within 10 days or such further time as may be requested and allowable, or, if they are unable to agree, shall submit their respective forms of judgment within the time set.

## ON MOTION TO RECONSIDER

The United States of America moves for reconsideration of this court's Findings of Fact and Conclusions of Law on the basis that Judge Weinstein's judgment in *Birnbaum* was modified on appeal insofar as it provided for a "suitable letter of regret and assurance of non-recurrence." *Birnbaum v. United States*, 588 F.2d 319 (2d Cir. 1978).

The motion is well taken. My earlier decision is therefore modified by deleting

the provision requiring the government to furnish to plaintiff a suitable letter of regret and assurance of non-recurrence and by increasing the award of general damages from $1,000 to $2,500. It follows that plaintiff's attorney is entitled to a fee of $625, payable out of the award to plaintiff.

I had originally considered the "suitable letter" to be part of the "compensation" awarded to plaintiff. If that requirement is not within the power of this court to provide, then I am of the opinion that the monetary ad damnum should be increased as stated.

The judgment to be entered herein shall be modified accordingly.